**ABRAHAM ZION CORP. and Lebow Clothes, Inc., Plaintiffs,**

v.

**Harry P. LEBOW, Individually and as Trustee of the Estate of Benjamin Lebow, Deceased, H. Poe Lebow, Ltd., Oakloom Clothes, Inc., and H. Poe Lebow, Ltd. and Oakloom Clothes, Inc., Doing Business as a Joint Venture, Defendants.**

No. 83 CIV. 1469 (CBM).

United States District Court,
S.D. New York.

June 25, 1984.

552

Golenbock & Barell by Stephen M. Rathkopf, Harold M. Hoffman, New York City, for plaintiffs.

Mark D. Lebow, New York City, for defendant Harry P. Lebow.

Felfe & Lynch, by Richard Bennett, New York City, for H. Poe Lebow, Ltd. and Oakloom Clothes, Inc.

Felfe & Lynch by Richard E. Bennett, New York City, for H. Poe Lebow Ltd., et al.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

MOTLEY, Chief Judge.

Plaintiffs bring this action alleging breach of contract, breach of fiduciary duty, and violation of various trademark laws. At the hearing on plaintiffs' motion for a preliminary injunction, the court ordered that the hearing be consolidated with a trial on the merits. The court's findings of fact and conclusions of law follow.

## I. *Findings of Fact*

### A. *The Parties*

Plaintiff Abraham Zion Corporation (AZC) is and was at all relevant times a Pennsylvania corporation with a place of business at 1290 Avenue of the Americas, New York, New York.

Plaintiff Lebow Clothes, Inc. (LCI) is a subsidiary of AZC, created on or after June 30, 1982. LCI is a Delaware corporation with a place of business at 1290 Avenue of the Americas, New York, New York. LCI is engaged, *inter alia*, in the business of manufacturing and selling higher-priced men's clothing, primarily to retail men's "specialty" shops throughout the United States, for resale to the general public.

Defendant Oakloom Clothes, Inc. is a Maryland corporation engaged in the business, *inter alia*, of manufacturing and selling men's clothing. Its principal place of business is in Maryland, and it also has a place of business at 1290 Avenue of the Americas, New York, New York.

Defendant H. Poe Lebow, Ltd. (HPL, Ltd.) is a Maryland corporation, created by defendant Harry P. Lebow in or about August of 1982, with its principal place of business in Maryland. It is engaged in the business of designing higher-priced men's clothing in connection with the manufacture and sale of such clothing by defendant Oakloom.

Defendant Harry P. Lebow, an individual, is a resident of the State of Maryland. Harry Lebow is engaged in the business of designing higher-priced men's clothing in connection with the manufacture of such clothing by defendant Oakloom.

### B. *Ownership of the "Harry Lebow" Name*

Lebow Brothers, Inc. (LB) was a Maryland corporation formed shortly after the turn of this Century by Benjamin Lebow, grandfather of defendant Harry Lebow. LB was engaged in the business of manufacturing and selling higher-priced men's clothing to men's clothing shops for resale

to the general public throughout the United States.

LB was the registrant and owner of the following federal trademarks: "Lebow Clothes," "The Lebow Collection," and a stylized "LB" logo (collectively, the Lebow Trademarks).

By agreement dated June 30, 1969 (the 1969 agreement), Victor Lebow, Sr., father of defendant Harry Lebow, together with certain individuals as trustees under the will of Benjamin Lebow (the Sellers), sold the stock of LB to After Six, Incorporated, a Pennsylvania corporation. (Plaintiff's Exh. 2.)

As part of the 1969 agreement, the Sellers warranted title in LB and/or an LB subsidiary to the trade name "Lebow Clothes" and, *inter alia*, to all trademarks necessary to conduct the business of LB. (Plaintiffs' Exhibit 2 at par. 3(f).) Paragraph 3(g) of the 1969 agreement reads as follows:

> In order further to secure to After Six the benefits of the *trade name* "Lebow," Sellers hereby agree not to *use* the said name *or any variant thereof* in any business transaction (other than those of After Six or its subsidiary or affiliated companies) in which they or any of them directly or indirectly have an interest as owner, employee or otherwise in connection with the men's clothing business. Except for the license agreements referred to in Exhibit C, neither Sellers nor Lebow [Brothers, Inc.] nor L.B. [International, Inc. (the LB subsidiary)] have licensed or granted to any person or entity the right to use the name Lebow, and Sellers know of no person or entity who claims the right to the use of the name "Lebow" in the mens' clothing industry.

(Plaintiffs' Exh. 2, par. 3(g) (emphasis added).) Three license agreements for use of the name "Lebow," none of which is relevant to the instant litigation, were listed in Exhibit C. (Plaintiffs' Exh. 2.) It is undisputed that the name "Harry Lebow" or "H. Poe Lebow" had never been used as a trade name or trademark in connection with LB products at the time of the 1969 agreement. (E.g., Trial transcript (Tr.) at 37.) At the time of the 1969 agreement, Harry Lebow worked primarily as a traveling salesman for LB, and assisted his father in the purchase of fabrics (called "piece goods") for the company (Tr. at 40,-265), and was not involved in the design of LB garments. The court finds that neither "Harry Lebow" nor "H. Poe Lebow" is a "variant" of the tradename "Lebow" and they were not assets of LB at the time of the 1969 agreement, never having been used by the company in connection with the manufacture or sale of its products. The names "Harry Lebow" and "H. Poe Lebow" were nothing more than personal names and LB had no rights in the names.

Under and subject to the terms of a trust under the will of Benjamin Lebow, Harry Lebow was to receive one-half of the purchase price of the stock owned by Benjamin Lebow paid by After Six to the trustee-Sellers. (Plaintiffs' Exh. 20 at, e.g., Item Five, par. H.)

The 1969 agreement further provided that LB enter into employment contracts with three individuals, including Harry Lebow. (Plaintiffs' Exh. 2, par. 10.) After the sale, LB entered into an employment agreement, on or about December 30, 1969. This contract provided, *inter alia*, that Harry Lebow would be Vice President of LB, performing the duties that he had performed for LB prior to the sale of stock to After Six. The term of the employment contract was "five (5) years, ending on the *earlier* of the 31st day of December, 1974, [Harry Lebow's] *death or six (6) months after [Harry Lebow's]* disability." The employment contract included a covenant not to compete, which covenant ran "[f]rom the date [of the employment agreement] until three (3) years after the expiration of this agreement or three (3) years after the termination by [Harry Lebow] of his employment by [LB] hereunder, whichever shall occur later...." (Plaintiffs' Exh. 3.) The employment agreement was not renewed and, by its terms, expired on December 31, 1974. Harry Lebow never terminated his employment under the agreement. The

covenant not to compete therefore expired no later than December 31, 1977. Harry Lebow's employment contract was not assignable, "except pursuant to a merger, consolidation or other reorganization of [LB]." (Plaintiffs' Exh. 3 at par. 10.)

Harry Lebow was later substituted as trustee under the will of Benjamin Lebow, and in that capacity signed an agreement dated February 25, 1971 (the 1971 agreement). The 1971 agreement sets forth terms for the payment of part of the purchase price of the stock of LB by After Six. The 1971 agreement recites that "the parties hereto are party to an Agreement dated June 30, 1969 ... providing ... for the purchase by After Six ... of all of the outstanding capital stock of [LB]...." (Plaintiffs' Exh. 4, at 1.)

After his father's death in 1971, Harry Lebow took on additional fabric buying and sales functions. In 1972, Harry Lebow was appointed president of LB. (Tr. at 126, 285.) In or about 1976, he began to design patterns for piece goods to be used in LB garments. (Tr. at 286, 290.) The fabrics were adapted to the LB "silhouette," which was generally a "middle of the road classic" garment. (Tr. at 287.) Harry Lebow selected the styles for the LB garments, as well as the fabrics used in those garments. (Tr. at 44, 285.) The key element of men's, as distinguished from women's, clothing design, is the design of fabric patterns. (Tr. at 287.) Harry Lebow was not, however, identified to the public or to buyers for retail stores as a designer of LB garments. (Tr. at 145–46.)

As of July 1, 1974, After Six and Harry Lebow entered into a new employment agreement, whose terms were embodied in a letter dated September 5, 1974. Pursuant to the new agreement, Harry Lebow was to receive a fixed salary plus a bonus keyed to LB's "pre-tax earnings," a medical reimbursement plan, and continuation of an insurance policy. (Defendants' Exh. G, first document.) The agreement did not include a covenant not to compete, nor did it include any restrictions on Harry Lebow's use of his name.

During the mid-1970's, Harry Lebow had personal contact with the vast majority of buyers for the various retail stores to which LB sold garments. (Tr. at 292.) He met with almost every buyer who visited LB's New York offices. (Tr. at 293.) By 1978, many buyers would not place orders until Harry Lebow had personally suggested fabrics or an "approach" for the particular store. (Tr. at 391–92.)

A new employment agreement for Harry Lebow was concluded on December 20, 1977, effective January 1, 1978. The terms of the agreement were memorialized in a letter dated December 22, 1977, and included an increase in Harry Lebow's fixed salary, as well as an increased percentage rate for calculating Harry Lebow's bonus. The agreement did not include a covenant not to compete, nor did it include any restrictions on Harry Lebow's use of his name. (Defendants' Exh. G, Second Document.)

In the late fall of 1978, Bernard Toll, Vice President for communications of After Six, approached Harry Lebow with a proposal to utilize Harry Lebow's name as a "designer" name in connection with the promotion and sale of LB garments designed by Harry Lebow. (Tr. at 294, 381–82.)

Toll's responsibilities for After Six included the oversight of all advertising and public relation for the divisions of After Six. (Tr. at 44.) Toll placed advertisements and signed contracts on behalf of After Six, and was involved in sales promotions and the negotiation of licensing agreements for the company. (Tr. at 380–81.) The court credits Toll's testimony that he personally negotiated licensing agreements with designers whose names After Six desired to use in connection with its products. Toll initiated these discussions, and was involved in direct discussions both with licensees and with attorneys for After Six. (Tr. at 380–81.)

Toll first broached his idea for a "Harry Lebow" campaign to Samuel Rudofker, at that time president of After Six. He suggested that Harry Lebow be approached and asked his permission to lend After Six

the use of his name. (Tr. at 381–82.) Toll then presented his idea to Harry Lebow. In response to Toll's proposal, Harry Lebow agreed to the use of his name, but insisted upon certain conditions in connection therewith, according to Toll:

> [Harry Lebow] said to me, "Look, Bernie, if I were to lend you my name I would want complete control. I would only want to put it on garments that I felt were worthy of my name, and the one thing I want clearly understood is that any time I decided to withdraw the use of the name, that has got to be my decision."

(Tr. at 383.) Toll agreed to the conditions set by Harry Lebow on the use of his name, particularly in view of the fact that no additional compensation for use of the name had been proposed. (Tr. at 383–84.)

Samuel Rudofker testified that Toll only had authority to discuss but not to enter into licensing agreements. (Tr. at 45.) Rudofker further testified that neither LB nor After Six had ever entered into an oral license agreement. (Tr. at 50; see also Tr. at 69, 89.) Toll also acknowledged that all of the other licensing agreements in whose negotiation he had been involved had been reduced to writing. (Tr. at 398–402.) Toll further testified that the oral agreement with Harry Lebow was the sole oral licensing agreement with which he had been involved while employed by After Six. (Tr. at 405–06.)

Samuel Rudofker also testified that he had a conversation with both Toll and Harry Lebow, in which the use of "Harry Lebow" as a designer name was discussed. Neither the issue of ownership of the "Harry Lebow" name nor the possible consequences of the termination of Harry Lebow's employment with After Six and LB was discussed in this conversation, according to Rudofker. (Tr. at 46–48.) Harry Lebow testified that he had no recollection of a conversation with both Rudofker and Toll. (Tr. at 297.)

In 1979, After Six embarked upon a "Harry Lebow" advertising and promotional campaign, including print, other media advertisements and personal appearances by Harry Lebow. (Plaintiffs' Exh. 5; Tr. at 51–53, 146, 240.) An integral element of the advertising campaign was a pictorial juxtaposition of Harry Lebow's "American Look" with the "European Look" produced by Angelo Vittucci, another designer who was employed by LB. (Plaintiffs' Exh. 5, Defendants' Exhs. B, C, D, E, F.)

Labels reading "A Harry Lebow Design" were prepared for and used on LB garments. These labels, of a type known as "sleeve labels," were sewn onto one sleeve of a garment, and also were sometimes used in the breast pocket of a garment, in conjunction with an LB label or a private store label. (Plaintiffs' Exhs. 6, 12; Tr. 54, 55.) Labels were also produced for individual retail stores, identifying Harry Lebow as the designer of the particular garment. In evidence are two labels of this type, reading "DESIGNED BY Harry Lebow EXCLUSIVELY FOR BARRY MARTIN FORT LAUDERDALE," and "Pure Cashmere By Harry Lebow SAKS FIFTH AVENUE," respectively. (Defendants' Exh. O; Tr. at 55.) Harry Lebow also functioned as a spokesman for LB. (Tr. at 405, 436.)

The "Harry Lebow" labels and advertising campaign were paid for by After Six. (Tr. at 51, 145–47.) This was not, however, an unusual arrangement in the clothing business. In most American designer licensing arrangements, the licensee-manufacturer pays for advertising and labels, according to John Weitz, an expert witness for defendants and himself a designer. (Tr. at 232, 242–43.) Furthermore, After Six also paid for the advertising of products manufactured under written licenses from other designers, including Bill Blass and Dimitri. (Tr. at 68–69.)

After Six paid Harry Lebow no licensing fees for the use of his name. (Tr. at 50.) As the court has previously found, however, Harry Lebow's compensation in excess of his fixed salary was a percentage of the profits of the company. (*See also* Tr. at 67–68.)

The court finds that Bernard Toll entered into an oral licensing agreement with Har-

ry Lebow, notwithstanding the credible testimony that Toll had no actual authority to do so. The court finds Toll's testimony as to the negotiation of the license with Harry Lebow to be credible. This testimony was not contradicted by Samuel Rudofker's testimony that the ownership of the "Harry Lebow" name was not discussed at a meeting attended by Toll, Rudofker, and Harry Lebow. (*See* Tr. at 47.) Toll was responsible for the negotiation of license agreements with designers, and had initiated the contacts between LB, Harry Lebow, and Angelo Vittucci, which culminated in the marketing of an "Angelo Vittucci" clothing line manufactured by LB. (Tr. at 381–82.) The court further finds that After Six had obtained no rights to the use of the "Harry Lebow" name for its products pursuant to the 1969 and 1971 agreements. The use of the "Harry Lebow" name by LB and After Six was pursuant to the oral license negotiated with Harry Lebow by Bernard Toll.

The court further finds that, notwithstanding the absence of a formal memorandum memorializing Toll's agreement with Harry Lebow or a Board of Directors resolution approving the agreement (*see* Tr. at 402–03), the company approved and carried out the Harry Lebow promotional campaign as conceived by Toll, consistently with the oral license negotiated by Toll with Harry Lebow. Moreover, the court finds that there would have been no need for After Six to seek Harry Lebow's approval for the use of his name by the company had the name, as plaintiffs contend, already been a proprietary asset of After Six. The company's actions in this regard were an implicit acknowledgement that After Six did not own the name "Harry Lebow."

A new employment agreement between After Six and Harry Lebow, effective July 1, 1980, was memorialized in a letter dated October 17, 1980. Harry Lebow's fixed salary was increased and his bonus arrangement was restructured. The agreement also provided for an increase in Harry Lebow's medical reimbursement benefits, as well as use by Harry Lebow of an automobile. The agreement contained no covenant not to compete nor any restriction on Harry Lebow's use of his name. (Defendants' Exh. G, third document.) The LB/After Six "Harry Lebow" campaign continued until June of 1981. (Tr. at 51.)

Sometime in 1980, After Six commenced efforts to sell some or all of its divisions. In connection with this effort, a document describing the various After Six divisions was commissioned from and prepared by an organization called Financo. (Tr. at 86.) The Financo report was circulated to all After Six division heads, including Harry Lebow as president of LB, before dissemination to prospective buyers. (Tr. at 88.) The Financo report stated, in pertinent part, that LB garments were "labelled under the style 'The Harry Lebow Collection' or 'Lebow Brothers,'" (Plaintiffs' Exh. 10 at D–5.) Contrary to plaintiffs' assertions, neither the Financo report nor Harry Lebow's failure to request changes in the report constitutes evidence of ownership by LB or After Six of the "Harry Lebow" name. The Financo report also stated that LB offered an "Angelo Vittucci" designer label. (*Id.*) It is undisputed that the Vittucci line was marketed pursuant to a written licensing agreement (Tr. at 387), yet there is no mention of ownership of the "Angelo Vittucci" name or of that licensing agreement in the Financo report. The Financo report does not negate therefore the existence of a licensing agreement with Harry Lebow, nor does it constitute evidence that After Six or Harry Lebow believed that After Six/LB enjoyed out-right ownership of the "Harry Lebow" name.

On or about June 30, 1981, After Six sold certain assets of LB to AZC, pursuant to a written agreement (the 1981 agreement). (Tr. 77–84, 167; Plaintiffs' Exh. 9.) The assets purchased by AZC included, *inter alia*,

All rights to use the corporate name of Lebow [Brothers, Inc.] and all other goodwill, names, slogans, trade names, patents, trademarks, copyrights, franchises, memberships or licenses of Le-

bow [Brothers, Inc.] (herein referred to as the "Lebow Intangible Rights").... (Plaintiffs' Exh. 9 at par. 1.1.11.) "Excluded Assets" included "[a]ll other assets ... other than as set forth in this Agreement." (*Id.* at par. 1.2.3.) The "Lebow Intangible Rights" were allocated a purchase price of $1.00. (*Id.* at par. 2.1.) LB warranted that LB had not done business within the ten years preceding the sale under any names other than the names set forth in an attached exhibit denominated Exhibit 8.2.4. (*Id.* at par. 8.2.4.) No exhibits are attached to the copy of the 1981 agreement that is in evidence, but the parties have stipulated that Exhibit 8.2.4. was a sheet with the word "None" written on it. (Tr. at 96–97.) Paragraph 8.2.14 of the 1981 agreement refers to an "Exhibit 8.2.14," which was to be a "schedule of all ... trademarks, trade names, patents and applications for patents owned by or registered or being used in the name of [LB]." (Plaintiffs' Exh. 9 at par. 8.2.14.) Robert Rudofker testified that there was no Exhibit 8.2.14 mentioning the "Harry Lebow" name. (Tr. at 92–93.) The 1981 agreement contains an integration clause (Plaintiffs' Exh. 9 at par. 14.6), and Robert Rudofker testified that there was no other agreement between After Six or LB and AZC pertaining to the sale of assets of LB to AZC. (Tr. at 93.) Defendants do not, however, dispute plaintiffs' assertion that, pursuant to the 1981 agreement, plaintiffs own the Lebow Trademarks. (Answer at par. 2.)

Following the sale of assets of LB to AZC, a new corporation, Lebow Clothes, Inc. (LCI) was formed by AZC to continue the business of LB. (Tr. at 174.) Alan Dinowitz, Vice-President of AZC, later sent Harry Lebow a letter dated December 20, 1981, informing Harry Lebow that, as of June 1, 1981 "you are new employees of the newly formed company." The letter continued:

Abraham Zion Corporation did not assume any liabilities or obligations, whether now in existence or hereafter created, of Lebow Bros., Inc., of After Six, Inc. with respect to:

Vacation pay, severance pay, medical disability, ... formal or informal agreements, oral understanding, bonus arrangements or any liabilities not enumerated.

(Defendants' Exh. I.)

Harry Lebow was not appointed president of the new company, nor was he appointed director, and he had no authority to sign checks or other documents on behalf of the company. (Tr. at 163–64, 174, 312–13.) In addition, Harry Lebow's bonus arrangement, medical reimbursement plan, and membership in a professional organization were terminated. (Tr. at 163–64.) Abraham Zion, president of AZC, assumed all responsibility for the management of LCI, either directly or through Alan Dinowitz. (Tr. at 163, 174–76.) Harry Lebow continued, however, to design garments for LCI, and his fixed salary was increased to $100,000 per year sometime after the formation of LCI. (Tr. at 127–28.) Harry Lebow no longer functioned as a spokesman for LCI. (Tr. at 174–76, 313.)

On August 6, 1981 Harry Lebow wrote to Abraham Zion requesting a face-to-face meeting to resolve their "difficult time establishing a proper working relationship...," and to reach some understanding regarding his responsibilities for LCI. He noted that he was "extremely uncomfortable" with the absence of an agreement between himself and LCI. (Defendants' Exh. H.) Neither AZC nor LCI entered into a new employment agreement with Harry Lebow, despite the request by Harry Lebow for such an agreement. (Tr. at 309.)

On or about August 28, 1981, Harry Lebow wrote a letter to Abraham Zion, stating:

Pursuant to my conversation with Alan Dinowitz yesterday in the New York Office, please be advised that the name "Harry Lebow" is my personal property and is not to be used by you of [sic] anyone else or any corporation for any purpose whatsoever.

(Plaintiffs' Exh. 7.) Thus, although the 1981 agreement is ambiguous as to wheth-

er the oral license was transferred to AZC, it is clear that Harry Lebow terminated the license no later than August of 1981, informing Abraham Zion that the "Harry Lebow" name was not to be used by Zion "or any corporation."

In response to Harry Lebow's letter, Abraham Zion telephoned Harry Lebow, and informed him that it was Zion's impression that AZC had acquired "the Harry Lebow Design" pursuant to the 1981 agreement. Abraham Zion further informed Harry Lebow that AZC did not intend to use the Harry Lebow name, and "instructed him not to continue using the label.... I requested him not to promote his name any more." (Tr. at 169.) Samuel Rudofker, who received a copy of Harry Lebow's August 28, 1981 letter, testified that he discussed the letter with Abraham Zion, Bernard Toll, and with corporate counsel for After Six. (Tr. at 55–56.) Rudofker further testified that he agreed with corporate counsel that the "Harry Lebow" name "was an asset that was owned by After Six by agreement," and had been sold to AZC. (Tr. at 56.) Samuel Rudofker prepared a letter to Harry Lebow, dated September 1, 1981, which stated:

> I received a copy of the letter that you sent to Abraham Zion concerning the name "Harry Lebow". It is my understanding that the name is an asset of Lebow Bros., Inc. that was sold to Mr. Zion.

(Plaintiffs' Exh. 8; Tr. at 56–57.) Samuel Rudofker testified that he was "practically positive" that he showed the letter to Bernard Toll before it was sent to Harry Lebow. (Tr. at 57.) Bernard Toll testified, however, that he had not seen the September 1, 1981 letter, and had not assisted in the preparation of the letter. (Tr. at 409–411.) The court finds that Samuel Rudofker prepared the September 1, 1981 letter, that it was mailed to Harry Lebow on or about that date, and that Bernard Toll neither assisted Rudofker in the preparation of the letter nor reviewed the letter before it was sent.

Harry Lebow sent another letter to Samuel Rudofker, dated September 17, 1981, in response to Rudofker's letter of September 1, 1981. Harry Lebow's letter reads:

> In reply to your letter of September 1st, could you please let me know what the source is for you believing that my name was an asset of Lebow Bros., Inc. that could be sold. I have no information that in any way could support that position.

(Defendants' Exh. P.) According to Harry Lebow, he received no reply to his September 17, 1981 letter. (Tr. at 328.)

At some point after the sale of LB assets to AZC, Harry Lebow instructed an employee of AZC or LCI to remove all unused "Harry Lebow" labels from plaintiffs' premises. The labels were removed. (Tr. at 157, 426–27.)

On or about September 3, 1981, Harry Lebow, while still in plaintiffs' employ, filed an application with the United States Patent and Trademark Office for registration of the name "Harry Lebow" for use in connection with, *inter alia*, men's clothing. (Plaintiffs' Exh. 15; Tr. at 148–50.) Harry Lebow did not notify plaintiffs of the filing of the application. (Tr. at 154, 349–50.)

In his application filed with the Trademark Office, Harry Lebow indicated that his first use of the name "Harry Lebow" in commerce was no later than January 1, 1979. (Plaintiffs' Exh. 15.) Harry Lebow filed an "A Harry Lebow Design" label as a specimen in connection with his application for registration. (Plaintiffs' Exh. 15; Tr. at 153–54.) The label was one that had been manufactured for LB in connection with the "Harry Lebow" promotional campaign. (Tr. at 154–55.)

The court finds that the goods produced under the name "Harry Lebow" beginning in 1979 were manufactured and sold by LB pursuant to the oral license for use of the "Harry Lebow" name that was negotiated by Bernard Toll.

The court further finds that Harry Lebow declared in his application to the Trademark Office that

he believes he is the owner of the trademark sought to be registered; that to the best of his knowledge and belief no other person, firm, corporation or association has the right to use said trademark in commerce.

(Plaintiffs' Exh. 15.) The court finds that, at the time of filing his application with the Trademark Office, Harry Lebow did "believ[e] he [was] the owner of the trademark sought to be registered." Similarly, the court finds that Harry Lebow believed to be true his declaration that, "to the best of his knowledge and belief no other person, firm, corporation or association ha[d] the right to use said trademark in commerce" at the time of the filing of the application.

The Trademark Office published notice of Harry Lebow's application on July 20, 1982. (Plaintiffs' Exh. 15.) The Trademark Office documents that are in evidence as Plaintiffs' Exhibit 15 do not bear any indication that opposition to registration of the mark was received.

Although notice of Harry Lebow's application was published, Abraham Zion testified that he was unaware of Harry Lebow's efforts to obtain registration of the "Harry Lebow" mark until the spring of 1983. (Tr. at 170–71.)

Harry Lebow left plaintiffs' employ on August 4, 1982. (Tr. at 315.)

The Trademark Office issued Registration No. 1,212,511 to Harry Lebow, for the mark "Harry Lebow" on October 12, 1982. (Plaintiffs' Exh. 15, Defendants' Exh. J.)

### C. *Trade and Consumer Recognition of the "Lebow" Name*

Prior to 1969, LB "did a small amount of national advertising" of its garments, under the "Lebow" name. This advertising was directed to the trade and to consumers. (Tr. at 101.)

From 1969 to 1978, LB primarily sold its garments to men's specialty stores for resale to the public under the Lebow Trademarks and the name "Lebow." (Tr. at 101–02, 396.) LB's total advertising expenditures, excluding expenditures in connection with "co-op" advertising, for the period from 1969 to 1979 did not, however, exceed $300,000.[1] The figure may actually have been closer to $100,000 for the period. (Tr. at 304–05, 384.) There was no evidence as to LB's pre-1979 expenditures on co-op advertising. (Tr. at 404.) The LB salesmen who dealt with LB's retail store accounts were, however, unhappy with the amount of advertising done by LB. (Tr. at 385, 415.) There were approximately 250–300 LB retail store accounts during the period 1969–1979. (Tr. at 292, 413.)

The "Lebow" name was known at that time to persons within the clothing trade but only to a limited extent in the small consumer market for high-priced men's clothing. (Tr. at 103, 247–49.) There was a market recognition problem among consumers. (Tr. at 129, 236–37.)

In 1979, LB and After Six began to promote the "Harry Lebow" name, either in conjunction with the LB corporate name or in conjunction with a retail store name. The "Harry Lebow" promotional campaign took the form of print and other media advertising on cooperative and non-cooperative bases, participation in trade shows, and personal appearances by Harry Lebow. (Plaintiffs' Exh. 5, Defendants' Exhs. B, C, D, E, F; Tr. at 51, 103, 130–34.) Harry Lebow was used as a spokesman for LB products. (Plaintiffs' Exh. 13; Tr. at 405, 436.)

Labels incorporating the name "Harry Lebow" were placed on LB garments designed by Harry Lebow. (Plaintiffs' Exhs. 6, 12; Tr. at 436, 594–95.) These labels were used on a small percentage of LB

---

**1.** "Co-op," or cooperative, advertisements are advertisements that are placed in local newspapers, radio and television by retail merchants. The wholesale cost of the product advertised incorporates a percentage allocated for co-op advertising. The manufacturer thereby pays a portion of the advertising expense on a coopera-

tive basis with the retailer. The percentage of the wholesale price allocated for advertising is not always, however, used toward advertising. The fund is sometimes used by the retailer to offset markdowns, losses, or returns of the manufacturer's product. (Tr. at 101, 173, 239.)

garments at first, and later used on "quite a bit" of LB clothing. (Tr. at 104.) There was testimony that "Harry Lebow" sleeve labels were placed on all LB garments at some point during the period 1979–1981, except those on which store labels or "Angelo Vittucci" labels were placed. (Tr. at 594–95.)

Some of the advertisements in evidence from this period bear the name "Harry Lebow" in large print, and the words "Lebow Clothes a division of After Six, Inc." in small print. (Plaintiffs' Exh. 5, Defendants' Exhs. B, C, D, E.) Defendants' Exhibit F, a newspaper advertisement picturing two garments, indicates that the garments are "[f]rom Lebow, manufacturer of luxury fabric sportcoats," and that Harry Lebow was scheduled to make a personal appearance at the Palm Beach branch store of Saks Fifth Avenue.

LB spent a total of $100,000 to $150,000 in the two-year period from 1979 to 1981 on print media advertisements, excluding co-op advertisements, and advertisements in other media. (Tr. at 305.) LB spent a total of $300,000 per year in 1979 and 1980 on advertising, including co-op advertising, attributable salaries, outside advertising agency fees, and costs of joint promotional projects attributable to LB. (Tr. at 53, 57, 71, 73–75.) It is unclear whether this figure includes advertising costs attributable to LB's "Angelo Vittucci" line of garments. Bernard Toll testified, however, that the amount spent in 1979 and 1980 for promotion of the "Harry Lebow" name was $50,000 per year. (Tr. at 404.)

LB's sales volume during this period was approximately $8,000,000 per year (Tr. at 67), representing sales of approximately 50,000 units of clothing per year. (Tr. at 419.)

The court finds that the investment of $300,000 per year in advertising efforts was not a substantial advertising expenditure for an established company like LB. (See Tr. at 251.)

There was no evidence about the amount of money expended by AZC or LCI after the 1981 sale of LB assets. There are in evidence, however, certain cooperative advertisements dating from the period following the assets sale. These advertisements bear the names "Lebow" or "LeBow." (Plaintiffs' Exh. 16.) There is no evidence to indicate that the name "Harry Lebow" has been used in advertising since the 1981 sale of LB assets. Abraham Zion had, furthermore, determined by August of 1981 that neither LCI nor AZC would use or promote the name "Harry Lebow" in connection with LCI products. (Tr. at 169.) No "Harry Lebow" labels have been placed on LCI garments since August of 1981. (Id.) The court finds that Plaintiffs' Exhibit 12, a jacket bearing a "Harry Lebow" sleeve label, was shipped from the LB or LCI factory prior to August of 1981.

The court finds that the name "Lebow" as that of a manufacturer of high-quality, high-priced men's clothing, is known among owners of and buyers for small men's specialty shops, and among a limited number of department stores (including Lord & Taylor and Saks Fifth Avenue.) (Defendants' Exh. F.; Tr. at 236–37, 507.) A retailer's decision to carry Lebow garments is, however, based primarily on the appearance, feel, and quality of the garment, rather than the Lebow name. (Tr. at 117–119.) Prior experience with the manufacturer is, however, an important factor in the retailer's decision. (Tr. at 119.)

A Lebow jacket in evidence bears a retail price tag of $495. (Plaintiffs' Exh. 12.) Other Lebow garments sell for prices in excess of $495. (Tr. at 119, 124.)

The average "Lebow" consumer is an affluent, well-educated, middle-aged-to-older man in the upper three-to-five per cent American income bracket. (Tr. at 102, 107–08, 247, 260.) This consumer is very sophisticated, "knows" clothing, and will carefully examine the look, feel and quality of the garment, and try it on before he buys it. (Tr. at 121–22, 260–63, 276.) Although some consumers will ask for a Lebow garment by name (Tr. at 113, 123, 125), and there are some repeat buyers of custom-made Lebow garments (Plaintiffs' Exh. 21; Tr. at 574–76), the average "Le-

bow" customer buys a Lebow garment because of the look, feel and quality of the garment, rather than because of the "Lebow" name. (Tr. at 259, 262, 277.)

The court finds that the "Lebow" name is not generally recognized among, or sought out by consumers (Tr. at 256) except among a small number of consumers in the high-priced men's clothing market. Lebow's consumer market, moreover, is, a shrinking one, because most Lebow consumers buy garments from men's specialty shops, whose numbers are also shrinking. The shrinking market is due in part to the growth of retail stores that discount "designer" clothing and thereby undercut the prices at which the specialty shops sell. (Tr. 253–54.)

### D. *Trade and Consumer Recognition of the "Harry Lebow" Name*

While he was associated with LB and LCI, Harry Lebow had personal contact with at least 70% of the buyers for retail stores to which Lebow garments were sold. (Tr. 293.) He was known personally by these buyers, who sought and respected his judgment in choices of styles and patterns. (Tr. at 269, 391–92.) Harry Lebow is, moreover, known personally among the "fraternity" of specialty retailers in the men's clothing trade. He is also known as a designer within the trade. (Tr. at 233–34, 245, 269, 391.) It is, moreover, well known within the trade that Harry Lebow is no longer associated with plaintiffs. (Tr. at 270–71.) There is no association of the name "Harry Lebow" with plaintiffs on their products in the minds of retail merchants.

The "Harry Lebow" promotional campaign did not result in significant consumer recognition of the "Harry Lebow" name, either by itself or as identified with the "Lebow" trade name or "Lebow" products, in part because the "Harry Lebow" name was often used in conjunction with a retail store name rather than the "Lebow" name. (Defendants' Exh. O.) Consumer recognition of Harry Lebow as a designer is virtually nonexistent. (Tr. at 245, 269–70.)

The name "H. Poe Lebow" had never been advertised or promoted to consumers at the time of trial. (Tr. at 143, 162.) Harry Lebow's full given name is "Harry Poe Lebow." (Tr. at 126, 315–16.)

### E. *False Designation of Origin Claim; Likelihood of Confusion*

On or about August 31, 1982, HPL, Ltd. (the corporation created by Harry Lebow) entered into an agreement with defendant Oakloom (the 1982 agreement) whereunder HPL, Ltd. agreed to design "Resort"-type men's clothing for manufacture by Oakloom. The 1982 agreement grants Oakloom the right to use the name "H. Poe Lebow," or a variation of that name "under the designation of 'Oakloom Clothes, a style of h. poe lebow' or a similar use of the name," for apparel designed by HPL, Ltd. (Plaintiffs' Exh. 17 at ¶¶ 1, 2, 3.) The only names to be used under the 1982 agreement are "Harry Lebow" and "H. Poe Lebow." (Tr. at 353–54; *see also* Tr. at 140.) The "Resort" apparel to be manufactured by Oakloom under the 1982 agreement is similar in type to the "cruisewear" products of plaintiffs. The quality of the goods manufactured by Oakloom pursuant to the 1982 agreement is, however, to be identical to that produced by Oakloom for many years. No change in Oakloom's manufacturing processes is contemplated. (Tr. at 142.)

Four labels have been proposed for use on the Oakloom garments. All are bright blue, with white and red lettering, and a small red graphic representation of an acorn. All measure approximately 2¼ by 3 inches. The labels read as follows:

—"H. Poe Lebow for Oakloom Clothes" (Defendants' Exh. K);

—"Harry Lebow for Oakloom Clothes" (Defendants' Exh. L);

—"Oakloom Clothes designed by Harry Lebow" (Defendants' Exh. M); and

—"Oakloom Clothes designed by H. Poe Lebow" (Defendants' Exh. N).

The labels are distinctive in design and color combination. (See also Tr. at 318, 323.)

Plaintiffs' labels in evidence are oblong, with a black background and white lettering. (Plaintiffs' Exhs. 6, 12; Defendants' Exh. O.) There is no aesthetic similarity between plaintiffs' labels and defendants' proposed labels. The court further finds that defendants' labels clearly indicate that Oakloom, not LCI, is the manufacturer of the garment.

The court also finds that it is very important that a designer be able to use his name in the marketing of goods designed by him. (Tr. at 229–31, 240.) It is customary in the clothing trade for a designer's name to appear on a label either alone or in conjunction with the name of the manufacturer. (Defendants' Exh. A; Tr. at 234.)

The court further finds that defendants' use of the names "Harry Lebow" and "H. Poe Lebow" in connection with the Oakloom products is not an attempt to capitalize on plaintiffs' market and reputation but is, rather, a good faith use by a person designing clothing of his own name in connection with garments actually designed by him.

### 1. *Likelihood of Confusion Within the Trade*

The court has found that retail merchants who carry plaintiffs' garments make purchases on the basis of look, feel and quality. Furthermore, the court has found that Harry Lebow is known personally by the vast majority of buyers for plaintiffs' retail merchant accounts and has an independent reputation within the trade as a designer. The court has also found that the majority of retail merchants who were familiar with plaintiffs' products and with Harry Lebow are aware that Harry Lebow is no longer associated with plaintiffs.

The court finds that there is no likelihood of confusion on the part of retail merchants or other persons within the trade as to the origin of the "Harry Lebow (or H. Poe Lebow) for Oakloom" products. Defend-ants' proposed label clearly identifies the manufacturer of the goods as Oakloom, and the designer as Harry, or H. Poe Lebow.

### 2. *Likelihood of Confusion Among Consumers*

The court has previously found that consumers of plaintiffs' products are sophisticated, well educated, "know" clothing, and purchase plaintiffs' products primarily because of the style and quality of the garments, rather than because of the "Lebow" name. The court has also found that the typical consumer of plaintiffs' products examines a garment carefully for look, feel and quality, and tries it on before making a purchase.

The court finds that this consumer, who carefully examines and tries on a garment before making a purchase is not likely to be confused by defendants' proposed labels. The designer of the garments is identified as "Harry," or "H. Poe Lebow," and the manufacturer is identified as Oakloom. Consumer recognition of the "Harry Lebow" name is virtually nonexistent, and the "H. Poe Lebow" name has not been promoted to consumers. The consumer who seeks a Lebow-manufactured garment will recognize that the manufacturer of defendants' garments is Oakloom, and will not be confused as to the origin of the goods.

The court further finds that there are many instances of different companies and designers using the same surnames, without resultant consumer confusion. Examples of such use are: Valentino/Mario Valentino; Sasson/Sassoon; Diane von Furstenburg/Egon von Furstenburg; Calvin Klein/Anne Klein; and Hickey-Freeman/H. Freeman. (Tr. at 236, 273.)

### F. *Non-Trademark Issues*

### 1. *Harry Lebow's Dealings with Other Manufacturers While Employed by Plaintiffs*

Between the fall of 1981 and February of 1982, Harry Lebow entered into discussions with Joseph A. Bank, a Baltimore clothing

manufacturer, regarding a possible design and manufacturing relationship with that company. (Tr. at 538–39.) In the course of these discussions, Harry Lebow delivered one of LCI's patterns to the Baltimore manufacturer. The pattern was a basic one for a "Tracer" model jacket. The "Tracer" model had been used by LB and LCI for at least ten years and had been updated frequently. (Plaintiffs' Exh. 19; Tr. at 540.) The "Tracer" pattern had been used in the manufacture of approximately 500,000 Lebow jackets over the preceding ten years. (Tr. at 558–59.) The pattern could have been reconstructed by buying a Lebow jacket of this model, taking it apart, pressing it, allowing for variance, and tracing the pieces. Both Harry Lebow and one of plaintiffs' witnesses, an LCI employee, testified that most pattern designers know how to compensate when reducing a suit back to a pattern for variances in the fabric shape caused by pressing. (Tr. at 560, 581–83.)

The pattern delivered to Joseph A. Bank by Harry Lebow was used in the preparation of two sample jackets (Tr. at 539.) Harry Lebow was dissatisfied with the quality of the samples, and no further use was made of the pattern. (Tr. at 539.)

In March of 1982, Harry Lebow commenced discussions with Oakloom regarding the design and manufacture of a line of clothing. (Tr. at 159, 570.) No agreement was concluded with Oakloom, however, until the end of August of 1982, after Harry Lebow had left plaintiffs' employ. (Tr. at 160, 570.) Harry Lebow did not give any of plaintiffs' patterns to Oakloom, nor did he give Oakloom any of plaintiffs' customer lists. (Tr. at 572.)

At least twenty-five orders have been taken for the garments to be manufactured under Harry Lebow's agreement with Oakloom. These orders were placed on the basis of sample garments with no labels in them. (Tr. at 140.) Twenty-five to thirty of the customers who have placed orders were LB or LCI customers. Harry Lebow knew these customers personally, and contacted them from memory without the use of an LCI customer list. (Tr. at 138.) No actual sales had been made of garments manufactured by Oakloom under the agreement with Harry Lebow as of the time of trial of this action.

### 2. *Misappropriation of Confidential Information*

#### a) *Pattern*

Harry Lebow used an LCI pattern only once, in connection with his discussions with Joseph A. Bank. Two sample garments were made and subsequently were rejected by Harry Lebow. No further use has been made of that pattern by Harry Lebow, Oakloom, or Joseph A. Bank. (Tr. at 537–39, 572.) The pattern is no longer in the possession of Harry Lebow. (Tr. at 544–45.)

#### b) *Customer List*

Harry Lebow testified that he did not take any LCI customer lists with him when he left plaintiffs' employ, and is not currently using any LCI customer list in connection with his venture with Oakloom. (Tr. at 137–38.) Harry Lebow has contacted LCI retail customers and suppliers on the basis of his previous personal associations with them, and has done so from memory. (Tr. at 138.) There was testimony that a customer list prepared for Harry Lebow in the spring of 1982 was not found in his office some eight or nine months after Harry Lebow's departure from plaintiffs' employ. (Tr. at 586–87.) Victor Lebow had, however, by that time taken over Harry Lebow's office. (Tr. at 588–89.) The court finds that Harry Lebow did not remove the customer list from plaintiffs' premises (Tr. at 137–38, 572), and that the list could have been removed by an employee of plaintiffs after Harry Lebow's departure from the company.

### 3. *Porsche Automobile*

While LB was a subsidiary of After Six, Harry Lebow had use of an automobile leased by the corporation. (Defendants' Exh. G; Tr. at 331–32.) It was customary

that Harry Lebow would purchase the leased automobile for his own use after the end of the lease term. (Tr. at 331–32.)

In or about November of 1977, a 1978 model year Porsche automobile was leased by LB for Harry Lebow's use. (Defendants' Exh. BB.) At the time that the leasing arrangement for the Porsche was entered into, Harry Lebow traded in an automobile that he owned personally in order to reduce the rental payments for the Porsche. (Tr. at 562.)

Harry Lebow continued to use the Porsche automobile after the purchase of LB assets by AZC in June of 1981. (Tr. at 332.) No evidence has been offered of an assignment of the vehicle lease from LB to AZC or LCI. (*See also,* Tr. at 562.) Furthermore, the vehicle lease agreement is not among the assets of LB enumerated in the 1981 agreement (Plaintiffs' Exh. 9 at ¶ 1), and AZC expressly disclaimed the assumption of any liabilities not enumerated in the 1981 agreement. (Defendants' Exh. I.) The court finds that the Porsche lease was not a corporate asset of AZC or LCI by virtue of the 1981 agreement.

Prior to the expiration of the lease term for the Porsche, Harry Lebow approached Alan Dinowitz, comptroller or vice-president of AZC (*Cf.* Tr. at 596 *with* Defendants' Exh. I), and explained to Dinowitz that he had always had a leased car and had always purchased the car at the end of the lease term. (Tr. at 332–33.) He also informed Dinowitz that customarily he had been issued a new leased car to replace the old one. (Tr. at 333.) Dinowitz gave Harry Lebow permission to purchase the Porsche. (Tr. at 333.) The court does not find credible Alan Dinowitz' testimony that he told Harry Lebow that Dinowitz would have to consult Abraham Zion with regard to purchase of the Porsche. (Tr. at 598.)

Harry Lebow purchased the Porsche with his own funds. (Defendants' Exh. BB.) Subsequently, Dinowitz informed Harry Lebow that he could not have a new leased automobile to replace the Porsche. (Tr. at 337–38.) Alan Dinowitz testified that he told Harry Lebow that he could not

buy the Porsche, but only after Harry Lebow had already purchased the car. (Tr. at 598.) Dinowitz further testified, however, that no efforts were made to rescind the purchase or to recover the automobile. (Tr. at 598.)

The court finds that, even if AZC had acquired the lease for the Porsche by virtue of the 1981 agreement, Dinowitz authorized Harry Lebow to purchase the car.

The court finds incredible Abraham Zion's testimony that Harry Lebow would have been "fired immediately" had he "misappropriated what [Zion] believed to be a corporate asset." (Tr. at 600.) There was testimony that Zion believed the Porsche to be a corporate asset. (Tr. at 598.) Zion did not, however, fire Harry Lebow after Lebow bought the Porsche. (Tr. at 601.) Zion also testified that he would have fired an employee who disagreed with him over an important issue of corporate policy. (Tr. at 600.) There was no evidence of a disagreement between Harry Lebow and Abraham Zion over an issue of corporate policy. Indeed, Zion testified that Harry Lebow had not disagreed with him on a matter of corporate policy. (Tr. at 175–76.)

### 4. *Piece Goods*

Subsequent to the 1981 purchase of LB assets by AZC, Harry Lebow continued to purchase piece goods for LCI. (Tr. at 428.) The only change from prior purchasing procedure was that a budget was submitted to Abraham Zion for approval before purchase of the goods. (Tr. at 428.) This policy was adhered to, and all piece goods purchased by Harry Lebow in 1981 and 1982 were used by the company. (Tr. at 429.)

## II.  *Conclusions of Law*

### A.  *The Harry Lebow Name*

■ Plaintiffs first argue that Harry Lebow is contractually barred from using "Harry Lebow" or "H. Poe Lebow" because he was a third party beneficiary of the 1969 agreement and, alternatively, because as a trustee acting for his own bene-

fit he signed the 1971 agreement which incorporated the 1969 agreement. These arguments are without merit. They are based on the premise that the 1969 agreement transferred to After Six as assets of LB the names "Harry Lebow" and "H. Poe Lebow" or prohibited the parties from using those names.

The sellers of LB transferred their rights to the Lebow trademarks and agreed not to use the trade name "Lebow" or any variant thereof. This Court has found, however, that prior to the 1969 agreement Harry Lebow did not design LB garments, the names "Harry Lebow" or "H. Poe Lebow" were never used by LB as trade names or trademarks, and that the names were neither variants of the "Lebow" trade name nor assets of LB but, instead, were simply personal names. In view of these findings, therefore, even if Harry Lebow were bound by the 1969 agreement by any theory of law, that agreement did not purport to transfer to After Six any rights in Harry Lebow's name or prohibit Harry Lebow from using his own name.

This conclusion is illustrated by the fact that, lacking ownership of the right to use Harry Lebow's name, LB used it to promote garments designed by him only after a license agreement was reached concerning the use of his name. After raising with After Six president Rudofker the subject of requesting permission from Harry Lebow to use his name, After Six vice-president Bernard Toll negotiated an oral license agreement to promote LB garments with the Harry Lebow name. Although Toll did not have the authority to conclude such license agreements, After Six and LB nevertheless pursued and carried out the promotional campaign consistent with that agreement and retained the benefits thereof. Under such circumstances, After Six can be said to have ratified the unauthorized license agreement negotiated by Toll. *Hewett v. Marine Midland Bank*, 86 A.D.2d 263, 449 N.Y.S.2d, 745, 751 (2d Dep't 1982); *J. Whitson Rogers, Inc. v. Bd. of County Comm'rs*, 285 Md. 653, 402 A.2d 608 (1979); *Linden Homes, Inc. v. Larkin*, 231 Md. 566, 191 A.2d 441 (1963).

LB's use of Harry Lebow's name was pursuant to the license agreement and its negotiation was implicit acknowledgement that After Six and LB never had the rights to Harry Lebow's name in the first place.

There are, therefore, no contractual bars to Harry Lebow's use of his name. Plaintiffs also argue that Harry Lebow is barred by trademark laws from using his name in connection with the sale of the garments he designs.

█ Harry Lebow is the registrant of a trademark on the principal register for the name "Harry Lebow" and is entitled to all the presumptions of validity that accompany registration. 15 U.S.C. § 1057(b). Plaintiffs contend, however, that this Court should cancel the registration pursuant to 15 U.S.C. § 1119 on the grounds that the application did not comply with the applicable rules and that it was fraudulently obtained and should not have been issued.

Specifically, plaintiffs allege that Harry Lebow's failure to indicate that the first use of his name was not by him but by LB did not comply with the application rules contained in 37 C.F.R. § 2.38. The Patent Office Trademark Trial and Appeal Board, however, has ruled that § 2.38(a) uses the permissive "may" regarding the identification of another company's prior use of the mark and is not mandatory. *Airport Canteen Services, Inc. et al. v. Farmer's Daughter, Inc.*, 184 U.S.P.Q. 622, 627–28 (1974). Harry's failure to identify LB was not fatal to the application and does not require cancellation on that ground.

█ Plaintiffs further allege that Harry Lebow's application was knowingly fraudulent with respect to the statement that he knew of no other entity or person who had the right to use the Harry Lebow name in commerce. The court has found that in August 1981, the month before the September 1981 application, Harry Lebow wrote to Abraham Zion directing him to stop using the Harry Lebow name and thereby terminated the license agreement. Thus, the court found that at the time of the applica-

tion, Harry Lebow in fact did believe that no one else had the right to use his name in commerce. Plaintiffs have failed to prove facts establishing their allegation of intentional fraud.

Finally, plaintiffs contend that this court should cancel the registration on the ground that its use would create consumer confusion with the previously issued Lebow marks owned by LCI. Plaintiffs have also raised the similar claims that the Harry Lebow/Oakloom labels violate the Lanham Act, 15 U.S.C. §§ 1114 and 1125 as well as related state laws.

■ Plaintiffs are asking this court to prohibit Harry Lebow from using his own name in connection with the profession in which he has been engaged for a number of years. This is an extreme sanction and is one that should not be considered lightly. *In Societ Vinicole de Champagne v. Mumm*, 143 F.2d 240, 241 (2d Cir.1944), the Second Circuit observed that "[t]o prevent all use of [one's family surname] is to take away his identity; without it he cannot make known who he is to those who may wish to deal with him; and that is so grievous an injury that courts will avoid imposing it, if they possibly can."

■ A leading case in this Circuit relating to trademark laws and personal names is *Taylor Wine Co., Inc. v. Bully Hill Vineyards, Inc.*, 569 F.2d 731 (2d Cir.1978) and it is one on which plaintiffs rely heavily. There, the court identified two principal factors to consider in determining the scope of injunctive relief in surname trademark infringement cases. First, "the fact that an alleged infringer has previously sold his business with its goodwill to the plaintiff makes a sweeping injunction more tolerable." *Id.* at 735. Second, "if an individual enters a particular line of trade for no apparent reason other than to use a conveniently confusing surname to his advantage, the injunction is likely to be unlimited." *Id.*

This is not a case where the alleged infringer has previously sold his business to the plaintiff. At the time of the sale,

Harry was just an employee of LB, primarily as a salesman. LB was sold in 1969 by Harry Lebow's father and the trustees under the will of his grandfather, Benjamin Lebow.

Further, this is not a case where the alleged infringer entered into the business for the sole reason to exploit a conveniently similar surname. Prior to entering into business with Oakloom, Harry Lebow had established a reputation for himself in the trade as a designer of high-priced men's clothing. His proposed work with Oakloom is simply a continuation of work in a field in which he has made his career for many years. The court in *Taylor* noted "when the defendant demonstrates a genuine desire to build a business under his own name, courts have been reluctant to proscribe all surname use whatever...." *Id.* at 735. Such is the case here.

The broad absolute injunction sought by plaintiffs, therefore, clearly would be unjustified in this case. In *Taylor,* the court barred the defendant's use of "Taylor" as a trade mark but permitted restricted use of his own name to show his connection with his company and only when accompanied by a disclaimer of connection with the plaintiff. There are, however, several important distinctions between this case and *Taylor.* Significantly, in *Taylor* the District Court had made findings that the first comer's "Taylor" trademark had acquired a secondary meaning. The Circuit Court thus was starting its analysis of the District Court's remedies with the conclusion that the plaintiff's and defendant's names/marks were confusingly similar. 569 F.2d at 733–34.

In contrast, we are not confronted here with a first comer that has given a secondary meaning to a family name. In fact, the court has found that the "Lebow" trade name is not generally known among consumers. Even among plaintiffs' narrower consumer market, the average Lebow customer is a sophisticated consumer who selects the product on the basis of its look, feel, and quality rather than the Lebow name. Under such circumstances, it can

hardly be contended that the "Lebow" name has acquired secondary meaning status. *See Perfect Fit Ind., Inc. v. Acme Quilting, Co., Inc.*, 618 F.2d 950, 952–53 (2d Cir.1980), *cert. denied*, 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 71 (1982). Indeed, the evidence supports the conclusion that "Lebow" is a relatively weak mark.

Further, it is well known within the trade that Harry Lebow is no longer associated with the plaintiffs, and retailers, many of whom know Harry Lebow through personal contacts, make no association of the name Harry Lebow with plaintiffs or their products. The Harry Lebow promotional campaign by After Six and LB never resulted in any significant consumer recognition of the name Harry Lebow either alone or as associated with the "Lebow" trade name.

Just because surnames are similar or, as in this case, the same, does not necessarily mean that they are *confusingly* similar. The evidence firmly leads to the conclusion that there is no likelihood of confusion either among consumers or within the trade caused by Harry Lebow's use of his name.

Another factor in the court's decision in *Taylor* was that the infringer had expressly indicated a connection between his goods and the first comer. Harry Lebow, however, has made no blatant attempt to associate his name, designs, or products with those of plaintiffs.

Additionally, the labels have no tendency to confuse consumers as to the source of the goods. The labels of defendants are not similar in appearance to those of plaintiffs. Furthermore, they clearly identify Harry Lebow as the designer and Oakloom as the manufacturer of the garments. It has been noted in *Bose Corp. v. Linear Design Labs, Inc.*, 467 F.2d 304 (2d Cir. 1972) that "there is hardly likelihood of confusion or palming off when the name of the manufacturer is clearly displayed." 467 F.2d at 310. There is, thus, little likelihood that consumers will be confused about the source of the products based on the Harry Lebow/Oakloom labels.

These factors significantly differentiate this case from the situation found in *Taylor* where some restrictions on the defendant's use of his name were imposed. The court noted that "[w]hen confusion is likely," some restrictions may be imposed and its entire analysis was based on the conclusion that confusion in fact existed. 569 F.2d at 735. Here, in contrast, the court has found no similar likelihood of confusion. A disclaimer of association between the plaintiffs' and defendants' products, therefore, is not a remedy available to plaintiffs because no infringement has been established. Such a disclaimer would serve little purpose because neither members of the trade nor consumers would associate the two. *See e.g., Continente v. Continente*, 244 F.Supp. 688 (N.D.Cal. 1965) ("John A. Continenti" did not infringe on registered trademark "Continenti" where no secondary meaning had attached to "Continenti" and there was no likelihood of confusion between plaintiff's and defendant's labels), *aff'd*, 378 F.2d 279 (9th Cir.1967).

The court has found no false representation concerning the origin of defendants' goods and no likelihood of confusion and, therefore, insufficient cause to order cancellation of the Harry Lebow trademark. These conclusions further dispose of plaintiffs' claims under the Lanham Act and their various related state claims based on New York's General Business Law § 368–b and its law of unfair competition. *See Perfect Fit, Inc. v. Acme Quilting Co., Inc.*, 618 F.2d 950 (2d Cir.1980) *cert. denied*, 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 71 (1982); *Stagelight Cosmetics, Ltd. v. Revlon, Inc.*, 218 U.S.P.Q. 500, 503 (S.D.N.Y.1982); *Commerce Foods, Inc. v. PLC Commerce Corp.*, 504 F.Supp. 190, 193 (S.D.N.Y.1980). Plaintiffs' dilution claim also fails. New York's General Business Law § 368–d was intended to protect extremely strong marks from use of a similar mark from use of a similar mark on dissimilar products. *See Sally Gee, Inc. v. Myra Hogan, Inc.*, 699 F.2d 621, 624–26 (2d Cir.1983); *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538, 399 N.Y.S.2d

628, 369 N.E.2d 1162 (1977). The court has already concluded that Lebow is not a strong mark. Additionally, plaintiffs' and defendants' products are both high-priced, high-quality men's garments and not sufficiently dissimilar. Finally, the court has found that Harry Lebow is not acting in bad faith or with predatory intent in his use of his own name on the products he designs.

### B. *Non-trademark Issues*

■ Plaintiffs contend that Harry Lebow misappropriated and disclosed their confidential information while he was employed with LCI including a suit pattern and a customer list. They also contend that he misappropriated LCI assets, specifically, a Porsche automobile. Plaintiffs argue that this conduct, together with his filing for trademark registration of his own name while still an LCI employee, entitles them to recoupment of his salary for the period of approximately one year prior to his leaving LCI. They also seek to enjoin his use of the purported confidential information.

The court has found that Harry Lebow did not take the customer list. It further found that the lease of the Porsche was not an asset transferred to AZC or LCI pursuant to the 1981 agreement and that even if the automobile lease had been an asset of plaintiffs, Harry Lebow was given permission to purchase the car by vice president Dinowitz. He did not, therefore, misappropriate the car. These findings dispose of the issues with respect to those items.

With respect to the others, the mere fact, assuming it were proven, that Harry Lebow would have been fired, had plaintiffs known about his conduct, does not establish that plaintiffs are entitled to the remedies they have requested. Additionally it would not establish that the disclosed information was confidential.

■ Harry Lebow was not bound by a contractual agreement to refrain from disclosing information. It cannot be disputed, however, that an employee has a fiduciary duty that exists independent of any con-

tract between the parties to refrain from such conduct in certain circumstances. *See, e.g., Lamdin v. Broadway Surface Adv. Corp.,* 272 N.Y. 133, 5 N.E.2d 66 (1936); *Byrne v. Barrett,* 268 N.Y. 199, 197 N.E. 217 (1935). The facts surrounding each alleged impropriety must be examined to determine whether as a matter of law Harry Lebow breached his duty to his employer.

Plaintiffs' contentions present claims arising out of state law. Plaintiffs appear simply to have assumed that New York law applies and generally have relied on New York cases despite the fact that some of the conduct complained of appears to have occurred in Maryland since Harry Lebow apparently resided there and maintained an LB and later an LCI office there. The choice of law problem was not briefed by the parties with respect to these issues. The court's own review of the law, however, reveals that New York and Maryland law essentially is governed by the same principles on these issues.

#### 1. *Plaintiffs' Customers and the Pattern*

■ The court has found that Harry Lebow did not take the list of customers from the LCI offices. Nevertheless, even absent the physical taking of a list, a former employee may not "solicit the customers of his former employer if they would be unknown to the employee but for information obtained during his prior employment." *Ability Search, Inc. v. Lawson,* 556 F.Supp. 9, 15 (S.D.N.Y.1981) (Motley, Ch. J.), *aff'd* 697 F.2d 287 (2d Cir.1982). In other words, if the identity of the employer's customers is secret or confidential information, disclosure would breach the employee's fiduciary duty to keep the employer's information confidential.

■ On the other hand, this court also has noted that "[g]enerally an employee is not barred from competing with his former employer." *Ability Search, Inc., supra,* 556 F.Supp. at 15. *Accord, Ritterpusch v. Lithographic Plate Service,* 208 Md. 592,

119 A.2d 392 (1956). Further, where information obtained while employed, such as the identity of customers, is not secret but generally available from public sources to members of the trade, a former employee may disclose it without breaching his fiduciary duty of loyalty to his employer. *See e.g., Maryland Metals, Inc. v. Metzner*, 282 Md. 31, 382 A.2d 564 (1978). Thus, a former employee "may solicit customers of his former employer who are openly engaged in the business or whose identity is readily or equally available to him." *Ability Search, Inc., supra*, 556 F.Supp. at 15. *See also AGA Aktiebolag v. ABA Optical Corp.* 441 F.Supp. 747 (E.D.N.Y.1977); *Leo Silfen, Inc. v. Cream*, 29 N.Y.2d 387, 328 N.Y.S.2d 423, 428, 278 N.E.2d 636, 640 (1972) (no injunction against competition with former employer where former employer's customers were "openly engaged in business in advertised locations and their names and addresses may readily be found by those engaged in the trade.").

■ Here, plaintiffs' customers are retail stores selling men's garments. It is not disputed that they were openly engaged in business and that at least some advertised themselves. Plaintiffs or their predecessors also engaged in cooperative advertising with stores which were advertised as selling plaintiffs' garments. Indeed, plaintiffs themselves actually published advertisements with extensive lists of their retail customers nationwide. Under such circumstances, it hardly can be contended that the identity of plaintiffs' retail customers is confidential information or a trade secret. Any use or disclosure of that information by Harry Lebow since his departure, therefore, is not a breach of confidentiality.[2]

■ For similar reasons, disclosure of the pattern to Joseph A. Bank was not a breach of his fiduciary duty. Harry Lebow and plaintiffs' own employee both were in agreement when they testified that it would be a simple matter for a pattern maker in the trade to reproduce the pattern for a garment merely by buying a sample of the garment, disassembling it, and, allowing for variances, tracing the outline of its component parts. The "information" in the pattern therefore was not confidential information because it was available generally through public sources to pattern makers in the trade. Again, "[t]here is no betrayal of confidence when there is no secret imparted." *General Bronz Corp. v. Ward Products Corp.*, 262 F.Supp. 936, 943 (N.D. N.Y.1966). There being no breach of confidentiality, there was similarly no breach of fiduciary duty.

Additionally, Harry Lebow and Joseph A. Bank never used the pattern commercially. They disapproved of the sample and never marketed anything made from it. Plaintiffs, therefore, can claim no injury from Harry Lebow's disclosure of the pattern. The fact that disclosure did not impact on any economic interest of plaintiffs in some detrimental fashion further supports the conclusion that Harry Lebow's disclosure of the non-confidential pattern was not a breach of his fiduciary duty. *Maryland Metals, Inc., supra*, 382 A.2d at 571.

### 2. *Trademark Application and Preparation to Compete*

Plaintiffs also point to Harry Lebow's trademark application and discussions with potential associates about competing with plaintiffs after leaving plaintiffs' employ. This conduct occurred while Harry Lebow was still an employee of plaintiffs and they contend that had they been aware of it they would have fired him. Again, however, plaintiffs are not entitled to the remedies they requested simply because they would have fired the employee for his conduct. That conduct must be found to have violated the employee's fiduciary duty of loyalty and confidentiality. Plaintiffs have pointed to no relevant cases which hold that similar conduct violates such a duty.

---

**2.** Plaintiffs have identified nothing in the record to establish that Harry Lebow solicited their customers while he was still employed by LCI.

Courts have recognized the public policy considerations against restricting free competition and a person's right to earn a livelihood. *See e.g., Tulumello v. W.J. Taylor Intern. Constr. Co., Inc.,* 84 A.D.2d 903, 446 N.Y.S.2d 673, 674 (4th Dept. 1981); *Maryland Metals, Inc., supra,* 382 A.2d at 569.

▇ As previously noted, a former employee generally is not barred from competing with his former employer. A correlate of this right to compete after termination is the right to make preparation prior to termination to set up or enter into employment with a competing business. In *Tulumello,* the court held that an employee did not forfeit his salary for entering into negotiations and purchasing a competing business prior to his termination of employment with his employer. 446 N.Y.S.2d at 674. In *Maryland Metals, Inc.,* the court held that employees did not breach their fiduciary duties by making secret preparations prior to termination to compete with their employer which included forming a corporation, contacting investors, applying for a loan to purchase equipment, and entering into agreements to purchase land and equipment for the competing facility. 382 A.2d at 570–71. The court further held that the employees were under no duty to notify their employer of their plans and preparations since to have done so would have made the right to engage in such conduct meaningless. *Id.* at 573. *See also Restatement (Second) of the Law of Agency,* § 393, Comment e (1958).

▇ Here, the court has already made findings and conclusions that plaintiffs did not own the Harry Lebow name but used it only pursuant to a license that was terminated by Harry Lebow prior to embarking on his preparations to leave plaintiffs' employ. Harry thus had the rights in the name in which he applied for a trademark registration. Further, the mere act of filing and obtaining trademark registration for his name resulted in no detrimental impact on plaintiffs' economic interests. *See Maryland Metals, Inc., supra,* 382 A.2d at 571. He never made any commercial use of the name while he was in plaintiffs' employ. Such preparatory conduct by Harry Lebow does not rise to the level of a breach of his fiduciary duty. Similarly, the discussions with Joseph A. Bank and Oakloom about potential collaboration clearly do not constitute a breach.

Plaintiffs' authorities are not to the contrary. There is no question that such a duty exists; the only issue here has been whether Harry Lebow's conduct was such as to constitute a breach of that duty. The line between permissible acts of preparation to compete and impermissible acts of disloyalty may not always be a clear one. On the facts in this case, however, Harry Lebow's conduct clearly does not cross that line into impermissible disloyalty. In contrast, the conduct of the employees in the cases cited by plaintiffs was of a much different type than Harry Lebow's and in some cases constituted extreme examples of disloyalty.

Plaintiffs rely heavily on *Harry R. Defler Corp. v. Kleeman,* 19 A.D.2d 396, 243 N.Y.S.2d 930 (4th Dept.1963); *app. dism'd,* 13 N.Y.2d 1174, 248 N.Y.S.2d 53, 197 N.E.2d 540 (1964). While still employees, the defendants formed a corporation and actually engaged in competition with their employer, the plaintiff company. They solicited the plaintiff's customers, caused the plaintiff to vouch for the credit of their corporation, charged to the plaintiff travel and phone expenses which they incurred while acting in the interest of their corporation, and even charged to the plaintiff the legal fees they incurred in incorporating their competing corporation. They also actively diverted the plaintiff's business to theirs. All this occurred while the defendants were still employed by the plaintiff, who had no knowledge of their activity, and not surprisingly was characterized by the court as disloyalty to a degree that was "completely astounding." 243 N.Y.S.2d at 934. Harry Lebow's conduct, on the other hand, simply was of no comparison. He did not misuse plaintiffs' funds and did not engage in actual competition, divert their business, or solicit their customers while still employed by them.

Furthermore, in *Kleeman*, the employees competed with their employer in large part by exploiting information they obtained from their employment and which had been found to be confidential and not readily available to those in the trade. Harry, in contrast, did not disclose confidential information.

In *Lamdin v. Broadway Surface Adv. Corp.*, 272 N.Y. 133, 5 N.E.2d 66 (1936), the employee made secret profits by taking commissions on the side which either would have gone to the employer or increased the employer's costs. In *Byrne v. Barrett*, 268 N.Y. 199, 197 N.E. 217 (1935), the employee obtained non-public, confidential information regarding negotiations concerning an imminent real estate deal with his employer, the brokerage firm, after which he resigned, concluded the deal himself, and obtained the commission for it. Again Harry Lebow's conduct was incomparable because he neither made secret profits while still employed nor exploited non-public information in diverting business from plaintiffs.

In *Frederick Chusid & Co. v. Marshall Leeman & Co.*, 326 F.Supp. 1043 (S.D.N.Y. 1971), the employees, while still employed, copied and made use of the procedures and materials used by their employer. None of the information constituted trade secrets of the employer, but the employees were contractually barred from using the information and the case is therefore inapposite. Harry Lebow was under no such contractual obligation. *Ranger Steel Products Corp. v. Chodak*, 128 N.Y.S.2d 607 (Sup.Ct. Nassau Co., 1953) involved information found to constitute trade secrets and *Cornale v. Stewart Stamping Corp.*, 129 N.Y. S.2d 808 (Sup.Ct. Westchester Co.1954) involved an employee who, while still employed, used information obtained while employed to make secret profits at the expense of the employer, and both cases are therefore incomparable.

C. *Consolidation of Hearing on the Motion For a Preliminary Injunction With the Trial on the Merits*

Finally, plaintiffs complain of this court's order consolidating the hearing on the injunction with a trial on the merits after plaintiffs had completed their direct case on the motion for the preliminary injunction. They contend that they were prejudiced by having no reasonable opportunity to conduct pre-trial discovery. The fact is, however, that this is not a case where the hearing on the preliminary injunction was held shortly after the complaint was filed. The hearing commenced a full three months after the complaint was filed during which time they apparently conducted *no* discovery. Plaintiffs certainly had a reasonable opportunity but neglected to do so.

The only prejudice they identify resulting from matters arising at trial for the first time relate to Harry Lebow's use of the pattern. Since this court has found the pattern to be non-confidential information and not a trade secret, they were not prejudiced by an inability to investigate independently the circumstances and they had ample opportunity to examine Harry Lebow at trial.

For the foregoing reasons, plaintiffs' complaint is dismissed in its entirety and judgment will be entered for defendants.