**ABRAHAM ZION CORPORATION and Lebow Clothes, Inc., Plaintiffs-Appellants,**

v.

**Harry P. LEBOW, individually and as trustee of the Estate of Benjamin Lebow, Deceased, H. Poe Lebow, Ltd. and Oakloom Clothes, Inc., doing business as a joint venture, Defendants-Appellees.**

**No. 763, Docket 84–7654.**

United States Court of Appeals, Second Circuit.

Argued Feb. 1, 1985.

Decided April 26, 1985.

Kenneth E. Newman, New York City (Allan R. Freedman, Jeffrey A. Conciatori, Donovan Leisure Newton & Irvine, New York City, on brief), for plaintiffs-appellants.

Mark D. Lebow, New York City (Coudert Brothers, New York City, on brief), for defendants-appellees.

Before NEWMAN, KEARSE and PRATT, Circuit Judges.

KEARSE, Circuit Judge:

Plaintiffs Abraham Zion Corporation ("AZC") and Lebow Clothes, Inc. ("Lebow Clothes"), appeal from a judgment of the United States District Court for the Southern District of New York, Constance Baker Motley, *Chief Judge,* dismissing their complaint seeking declaratory and injunctive relief, damages, and an accounting against defendants Harry Poe Lebow ("Harry" or "Harry Lebow"), Oakloom Clothes, Inc. ("Oakloom"), and H. Poe Lebow, Ltd. ("HPL"), for, *inter alia,* unfair competition, breach of contract, and trademark infringement in violation of the Lanham Act, 15 U.S.C. §§ 1051, *et seq.* (1982), following a consolidated hearing on plaintiffs' motion for a preliminary injunction and on the merits of the action. On appeal, plaintiffs contend that the district court abused its discretion in advancing the trial on the merits and erred in holding that Harry had not committed breach of contract or trademark infringement. We find none of plaintiffs' arguments persuasive and we affirm the judgment of the district court.

## I. BACKGROUND

Lebow Clothes, a subsidiary of AZC, manufactures and sells fine men's clothing, largely to men's specialty shops, for resale to a market consisting primarily of affluent, well-educated, middle-aged and older males. Sales of so-called "cruise wear," which is sportswear worn by such men at resorts, accounts for a substantial portion of Lebow Clothes' sales volume. AZC owns the federally registered trademark "Lebow Clothes," "The Lebow Collection," and a stylized "LB" logo. Lebow Clothes garments bear these trademarks and the "Lebow" name.

Harry Lebow is a designer of fine men's clothing. Until mid-1981 he had designed for and held various high managerial positions at Lebow Clothes' predecessor company, Lebow Brothers, Inc. ("Lebow Brothers"); from 1981 to August 1982, Harry designed clothes for Lebow Clothes. Oakloom is a manufacturer of men's clothing, including cruise wear, selling such clothing to retail merchants. Shortly after leaving Lebow Clothes, Harry formed HPL and executed an agreement between HPL and Oakloom, calling for HPL to design men's resort apparel to be manufactured by Oakloom.

Plaintiffs contend that, in light of various contracts described below, including agreements pursuant to which the stock of Lebow Brothers was sold to After Six, Inc. ("After Six"), and the assets of Lebow Brothers were thereafter sold by After Six to AZC, Harry Lebow may not use the name "Harry Lebow" on his designs for Oakloom.

### A. *The 1969 Sale of Lebow Brothers to After Six and Harry's Early Roles*

Lebow Brothers was formed by Benjamin Lebow, Harry's grandfather. The company manufactured and sold fine men's clothing to retailers, using the "Lebow"

name as well as the federally registered trademarks "Lebow Clothes," "Lebow Collection," and the stylized "LB" logo. After the death of Benjamin Lebow, all of the common stock of Lebow Brothers was owned by (1) Victor D. Lebow, Sr. ("Victor Sr." (Harry's father)), and Meyer Lebow, individually, and (2) Victor Sr., Joseph A. Waldman, and Meyer Kushnick as trustees of a trust established by Benjamin Lebow's 1957 will, from which Victor Sr. was to receive income during his lifetime and in which Harry was to receive a 50% interest upon Victor Sr.'s death if Harry survived him.

In an agreement dated June 30, 1969 ("1969 Agreement"), Victor Sr., Waldman, and Kushnick (the "Sellers") agreed to sell all of their common stock in Lebow Brothers to After Six. The agreement recited that After Six was simultaneously entering into agreements whereby it would also acquire all of the Lebow Brothers common stock owned by Meyer Lebow and all of the Lebow Brothers preferred stock from its various owners. In the 1969 Agreement, the Sellers warranted that Lebow Brothers had title to, *inter alia*, the trade name "Lebow Clothes" and all trademarks and trade names necessary to conduct the business of Lebow Brothers and its subsidiary. In ¶ 3(g) of the 1969 Agreement, the Sellers agreed not to use, in connection with the men's clothing business, the trade name "Lebow" or "any variant thereof":

> *Use of Name "Lebow".* In order further to secure to After Six the benefits of the trade name "Lebow", Sellers hereby agree not to use the said name or any variant thereof in any business transaction (other than those of After Six or its subsidiary or affiliated companies) in which they or any of them directly or indirectly have an interest as owner, employee or otherwise in connection with the men's clothing business. Except for the license agreements referred to in Exhibit C, neither Sellers nor Lebow [Brothers] nor L.B. [International, Inc., a Lebow Brothers subsidiary] have licensed or granted to any person or entity the right to use the name Lebow, and Sellers

know of no person or entity who claims the right to the use of the name "Lebow" in the men's clothing industry.

At the time the 1969 Agreement was signed, Harry was a vice president of Lebow Brothers. His duties consisted principally of calling on accounts in the southwest region of the country, selling to retailers in the New York showroom, and assisting in selecting piece goods, which are the fabrics used in the garments. He did not design piece goods or apparel at that time, and Lebow Brothers had never used the names "Harry Lebow" or "H. Poe Lebow" in connection with its garments.

The 1969 Agreement required that Lebow Brothers enter into employment contracts with Harry, his father, and his brother ("Victor Jr."). Harry accordingly entered into a five-year contract with Lebow Brothers upon its sale to After Six, which provided that Harry would be vice president of Lebow Brothers, to perform such duties as "heretofore have been performed by him." In that employment contract, Harry agreed not to compete with After Six in the sale of men's clothing for a period ending not less than three years after the December 31, 1974 termination date of the contract. Harry entered into three subsequent employment contracts with After Six, effective July 1, 1974, January 1, 1978, and July 1, 1980. Each of these three agreements called for Harry to receive, *inter alia*, a salary plus a bonus calculated with reference to Lebow Brothers' pre-tax earnings; none contained a covenant not to compete. None of the four employment contracts contained any provision restricting Harry's right to use his own name in the men's clothing business.

Shortly after the sale of Lebow Brothers, Harry was substituted as a trustee under his grandfather's will. On February 25, 1971, as one of the trustees, he executed an agreement ("1971 Agreement") that set forth terms for the payment of part of the purchase price of the stock of Lebow Brothers by After Six. The first "WHEREAS" clause of the 1971 Agree-

ment stated, *inter alia*, that "the parties hereto are a party to [the 1969 Agreement]...."

In 1971, upon the death of his father, Harry assumed additional sales responsibilities and became the piece goods buyer for Lebow Brothers. He became president of the company in 1972. Approximately four years later, he began designing piece goods.

### B. Lebow Brothers' "Harry Lebow" Campaign

For some time after Harry began to design piece goods, which is the principal function of a menswear designer, he was not identified to the public as a designer of Lebow Brothers clothes. Then, in the fall of 1978, Bernard Toll, a vice president of After Six, suggested to Samuel Rudofker, the company's President and Chairman, that "perhaps we talk to Harry Lebow and see if Harry Lebow could not be persuaded to lend us his name." Toll testified that Harry's response to the proposition was that his agreement would be contingent on his having "complete control" and freedom to withdraw the use of his name at any time. Toll testified that he assented to these conditions, recognizing that the company was not offering to pay Harry license fees, and thereupon After Six entered into an oral licensing agreement to use Harry's name.

The licensing agreement between Harry and After Six was not put into writing, and apparently was the only licensing agreement entered into by After Six that was not in writing. Rudofker testified that Toll had authority to discuss, but not to enter into, such agreements.

Nonetheless, in 1979, garments that Harry designed were affixed with the label "A Harry Lebow Design" and sometimes with a label identifying Harry as having designed the garment for a particular retailer. Lebow Brothers launched an advertising and promotion campaign featuring the "Harry Lebow" name. The campaign included print advertising and personal appearances by Harry. After Six paid for these advertising and promotional materials as it did for similar materials used to promote clothing designed by its other licensors. Toll estimated that from 1979 through 1981, After Six spent approximately $100,000 advertising the Harry Lebow name in the print media, excluding cooperative advertising. In contrast, the company had spent approximately that amount for the entire preceding decade's advertising.

### C. The 1981 Sale of Lebow Brothers to AZC

By agreement dated June 30, 1981, ("1981 Agreement"), AZC purchased certain assets and rights owned by Lebow Brothers and After Six, including, *inter alia*, "[a]ll rights to use the corporate name of Lebow [Brothers] and all other goodwill, names, slogans, trade names, patents, trademarks, copyright, franchises, memberships or licenses of Lebow [Brothers]...." Harry was not a party to this agreement and After Six did not include the name "Harry Lebow" among those it was transferring. AZC formed a new corporation, Lebow Clothes, which continued the Lebow Brothers business. Abraham Zion became president of Lebow Clothes, and managed the company directly or through an employee, Alan Dinowitz. Harry was not an officer or director of Lebow Clothes, but continued to design clothes for the new company, for which he was to receive a salary but no bonus.

On August 6, 1981, Harry and Victor Jr. wrote to Abraham Zion requesting a meeting to discuss their working relationship with AZC and their discomfort with not having employment contracts with Lebow Clothes. No employment contract was forthcoming from either AZC or Lebow Clothes. On August 28, 1981, Harry wrote to Zion, stating as follows:

> Pursuant to my conversation with Alan Dinowitz yesterday in the New York Office, please be advised that the name 'Harry Lebow' is my personal property and is not to be used by you of [sic] anyone else or any corporation for any purpose whatsoever.

Zion testified that he telephoned Harry and told him that AZC had acquired "the Harry Lebow Design," that AZC did not intend to use the "Harry Lebow" name, and that Harry should no longer promote the name. Rudofker, who had received a copy of Harry's letter, followed by a telephone call from Zion, sent Harry a letter dated September 1, 1981, stating, "[i]t is my understanding that the name ['Harry Lebow'] is an asset of Lebow Bros., Inc. that was sold to [AZC]." Harry responded in a letter dated September 17, 1981, stating that he had no information that could support Rudofker's position and asked Rudofker for the source of his belief that Harry's name was an asset of Lebow Brothers. Harry testified that he received no response to this letter.

In early September 1981, while still employed by AZC, Harry filed an application with the U.S. Patent and Trademark Office for registration of the name "Harry Lebow" for use in connection with, *inter alia*, men's apparel. The Trademark Office published notice of Harry's application in July 1982 and registered the mark to Harry in October 1982. Abraham Zion testified that he did not become aware of Harry's application until the spring of 1983.

Harry remained employed by AZC and Lebow Clothes until August 1982, when he left AZC and Lebow Clothes and formed HPL. Shortly thereafter, HPL entered into an agreement with Oakloom for the design of men's resortwear by HPL to be manufactured and sold by Oakloom. Section 12 of the agreement provided that all HPL designs "sold by Oakloom shall bear a designation identifying such Apparel as *'Oakloom clothes, a style by h. poe lebow,'* unless specifically exempted by [HPL]" (emphasis in original). Harry testified that he intends also to include on his Oakland designs a label stating one of the following: "Oakloom Clothes designed by Harry Lebow"; "Oakloom Clothes designed by H. Poe Lebow"; "Harry Lebow for Oakloom Clothes"; or "H. Poe Lebow for Oakloom Clothes". Such labels were introduced into evidence at trial.

## D. *The Proceedings Below*

AZC and Lebow Clothes commenced this action on February 25, 1983, by filing a nineteen-count complaint asserting that plaintiffs owned all rights to the "Harry Lebow" name. It alleged, *inter alia*, that defendants' use of the name "Harry Lebow" infringed plaintiffs' federally registered trademarks, in violation of the Lanham Act, 15 U.S.C. § 1114, constituted false designation of origin under 15 U.S.C. § 1125, amounted to unfair competition, misappropriation, and a breach of the 1969 Agreement, and violated N.Y.Gen.Bus.Law §§ 368–b, 368–d (McKinney 1984). The complaint also charged that Harry had breached an employment contract covenant not to compete with After Six and had breached his fiduciary duty to Lebow Clothes by using its confidential information for the benefit of himself and Oakloom. The complaint sought injunctive relief, damages, an accounting, and a declaratory judgment canceling Harry's trademark.

Upon filing the complaint, plaintiffs moved for a preliminary injunction to prohibit defendants from infringing plaintiffs' registered trademarks and to restrain Harry from divulging any confidential information of Lebow Clothes. The hearing on the motion was adjourned several times by stipulation and was finally commenced on May 24, 1983. At the close of plaintiffs' evidence, which consisted of numerous documents and the testimony of six witnesses, defendants moved for judgment dismissing the action on the merits. The court reserved judgment until the next day.

On the following day, the court announced that it would continue to reserve its decision, thereby requiring defendants to proceed with their evidence, and it informed the parties that it would advance the trial on the merits and consolidate it with the injunction motion hearing, pursuant to Fed.R.Civ.P. 65(a)(2). Plaintiffs' objection to the consolidation was overruled, and plaintiffs were given permission to file an amended complaint, to conduct addition-

al discovery, and to recall Harry for additional testimony. The court set May 31, 1983, as the date for defendants' presentation of evidence and June 7 for plaintiffs' presentation of additional evidence.

Following the additional presentation of evidence and the submission of briefs and proposed findings of facts and conclusions of law, the court, in an opinion reported at 593 F.Supp. 551 (1984), ruled against plaintiffs on all of their claims.

The court held that Harry was not contractually barred from using his name commercially. Without reaching plaintiffs' argument that Harry was bound to the 1969 Agreement as a third-party beneficiary and as a substitute trustee by virtue of the 1971 Agreement, and thus could not use any variant of the name "Lebow," the court held that "Harry Lebow" was a personal name and not a variant of "Lebow". It found that After Six had not owned the name "Harry Lebow," and the name therefore was not an asset that After Six owned or sold to AZC. The court found it unclear whether After Six's license to use the name had been conveyed to AZC but it found that, in any event, the license had been terminated no later than August 1981.

The court also found that the "Harry Lebow" trademark did not infringe the Lebow marks owned by AZC. The court observed that to prohibit the use of a personal name in conjunction with a profession in which an individual is established was an "extreme sanction." The court held that the Lebow name was not generally known among consumers and that AZC's trademarks were "relatively weak," possessing no secondary meaning; that Harry had established personal contacts within the trade and had an independent reputation as a designer, but his name had little or no consumer recognition; that purchasers of Lebow Clothes were sophisticated and induced to buy a garment by its quality, not because of the Lebow name; that such consumers would not be misled as to the source of Harry's apparel because his labels identify Oakloom as the manufacturer and because the buyers examine and try on

the clothing before purchasing it; that retailers were not likely to be confused with respect to the origin of Harry's products because they were motivated to purchase clothing by its physical characteristics, because it was well known within the trade that Harry was no longer associated with plaintiffs, and because there was "no association of the name 'Harry Lebow' with plaintiffs on [*sic*] their products in the minds of retail merchants." The court also found that Harry's labels bore no aesthetic similarity to AZC's, being different in shape and color, and clearly designating Oakloom as Harry's manufacturer, and that Harry's marketing efforts had been undertaken in good faith. The court concluded that Harry's use of his name would not result in a likelihood of confusion among consumers or the trade. Finally, the court found that Harry had not committed the various acts of unfair competition that were alleged.

The court ordered the complaint dismissed. This appeal followed.

## II. DISCUSSION

On appeal, plaintiffs contend, first, that the district court abused its discretion in advancing the trial on the merits because it denied them the opportunity to conduct a consumer survey showing the strength of the "Lebow" trademarks and actual consumer confusion. In addition, plaintiffs assert that the district court erred by not analyzing their trademark infringement claim under the factors established in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961), and that it erred in finding that "Harry Lebow" was not a variant of "Lebow" and in not finding that Harry is contractually barred from using his name as a trade symbol. Finding no merit in any of plaintiffs' contentions, we affirm the judgment.

A. *The Consolidation of the Preliminary Hearing with the Trial on the Merits*

Fed.R.Civ.P. 65(a)(2) provides that

[b]efore or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application.

The court must give the parties notice of such consolidation sufficient to give them an adequate opportunity to present their case. *E.g., University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981); *Galella v. Onassis,* 487 F.2d 986, 997–98 (2d Cir.1973); 7 J. Moore, J. Lucas & K. Sinclair, *Moore's Federal Practice* ¶ 65.04[4] (2d ed. 1984); 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2950, at 486–88' (1973). Given the broad discretion accorded the district court by Rule 65(a)(2), the court's order of consolidation will not be overturned on appeal absent a showing of substantial prejudice in the sense that a party was not allowed to present material evidence. *E.g., Johnson v. White,* 528 F.2d 1228, 1231 (2d Cir.1975); *Eli Lilly & Co. v. Generix Drug Sales, Inc.,* 460 F.2d 1096, 1106–07 (5th Cir.1972).

Plaintiffs rely principally on two arguments in support of their attack on the consolidation order. They contend that they were surprised by the order because a prior motion by defendants to advance the trial had been denied by the court and that the advancement of trial prevented them from conducting a consumer survey to develop evidence as to the strength of the Lebow trademarks and as to actual confusion in the marketplace. We are unpersuaded that plaintiffs have shown any prejudice from the order of consolidation.

■ Any surprise felt by plaintiffs at the court's order of consolidation was adequately offset by the notice given and by the court's granting plaintiffs leave to amend their complaint, conduct additional discovery, and recall the key defendant to the witness stand. A thirteen-day period was provided before the date on which plaintiffs were to present their additional evidence. *See* 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2950,

at 488 (suggesting that ten days' notice may be sufficient). The court repeatedly asked plaintiffs' trial counsel what additional evidence they wished to present. They at no time identified any additional trademark evidence they wished to present. At the close of the last scheduled day of the advanced trial, the court granted plaintiffs permission to take the deposition of an additional out-of-state witness on nontrademark issues and to supplement the trial record with the deposition transcript; plaintiffs then served deposition notices on five out-of-state witnesses, but it does not appear that the depositions were ever taken.

■ Plaintiffs' complaint that the advancement of the trial prevented them from conducting a consumer survey to present evidence of actual confusion in order to support their request for damages, seems to be pure appellate afterthought. The trial court inquired as to what evidence plaintiffs would like to produce with respect to damages; at no time did plaintiffs advise the court that they required a delay in the trial so that a consumer survey could be conducted.

In any event, the argument that plaintiffs were prejudiced by the lack of an opportunity to conduct a consumer survey to show the strength of the Lebow trademarks and to show actual consumer confusion is doubly flawed. First, both of these factors were material to the request for a preliminary injunction, and plaintiffs could reasonably have been expected to take steps to develop evidence of them to support that motion in the three months that elapsed between their commencement of the suit and the first hearing date. The relative strength of the Lebow trademarks was plainly a material factor in assessing the likelihood of confusion, which is central to the right to obtain preliminary injunctive relief. And though plaintiffs assert that they had had no need to develop proof of actual consumer confusion because that issue related only to their demand for damages and not to their request for a preliminary injunction, this position is, especially given other arguments they make on this

appeal, specious. Thus, as discussed in Part II.C. below, plaintiffs contend that in assessing the likelihood of confusion, the district court erred by failing to consider the factors set forth in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492. One of those factors, however, is actual confusion. Thus, to the extent that plaintiffs believed it appropriate for the court to consider the *Polaroid* factors in assessing likelihood of confusion, they should have been prepared at the preliminary injunction hearing to present evidence of actual confusion.

The second flaw in plaintiffs' claim of prejudice from not having conducted a consumer survey is that it hardly seems likely that such a survey would have been productive. As discussed in Part II.C. below, the evidence suggested that the Lebow name enjoyed very little consumer recognition. Further, the trial record indicates that, although retail orders had been placed for the Oakloom-HPL line, none of this clothing had yet reached the stores. Thus, there could have been no actual consumer confusion, and the fact that plaintiffs may not have had an opportunity to conduct a consumer survey is immaterial.

In sum, plaintiffs have failed to show that the district court abused its discretion in ordering the advancement of the trial on the merits for consolidation with the hearing on the preliminary injunction motion.

### B. *The Contract Claim*

Plaintiffs contend here, as they did in the district court, that Harry was contractually barred from using his name on the designs for Oakloom because (1) plaintiffs acquired, through the 1969 Agreement, the name "Lebow" and any variant of that name for use in connection with the men's clothing business, and (2) Harry (a) was a third-party beneficiary of that agreement and was therefore bound by it, or, (b) became a party to it by his execution of the 1971 Agreement as successor trustee of the trust created by his grandfather's will. Plaintiffs challenge the district court's rejection of this argument, contending that the court's finding that "Harry Lebow," as Harry's personal name, was not a "variant" of the name "Lebow" is contrary to the intention evinced by the parties. Even assuming, however, that "Harry Lebow" is a variant of "Lebow," we uphold the district court's dismissal of plaintiffs' contract claims because in fact neither the 1969 Agreement nor the 1971 Agreement transferred to plaintiffs' predecessor the right to use the name "Harry Lebow," and, under Pennsylvania law, by which the agreements were to be governed, neither agreement barred Harry's use of his name.

Although plaintiffs assert that the 1969 Agreement "transfer[red to After Six] exclusive rights in the Lebow name in any form in connection with the men's clothing business," and that "the district court was simply wrong when it found that After Six had not purchased the exclusive rights to the Lebow name and all its variants," the agreement itself does not support this contention. In the 1969 Agreement the Sellers agreed to sell After Six their common stock holdings in Lebow Brothers. In ¶ 3(f), the Sellers represented that at the closing of the agreement, Lebow Brothers would "possess the trade name 'Lebow Clothes' and all ... trademarks, trademark rights, trade names, [and] trade name rights ... necessary to conduct [its] business[ ]." There was no representation that Lebow Brothers owned all variants of the Lebow name, nor any suggestion that it owned the name "Harry Lebow". Lebow Brothers had not used the name "Harry Lebow"; indeed, the 1969 Agreement was entered into some seven years before Harry began designing clothes. Finally, ¶ 3(g) of the 1969 Agreement, relied on by plaintiffs, is not a provision for the transfer of any rights; in it the Sellers merely agreed that "Sellers" would not "use" the name "Lebow" or any variant thereof in connection with the men's clothing business. Thus, although this provision might have barred the Sellers from using Harry's name, the mere promise of forbearance by the Sellers did not give a right of use to the buyers.

The conclusion that After Six did not acquire the right to use Harry's name in

the 1969 Agreement is further supported by After Six's own actions in seeking to obtain a license from Harry in 1978 to use Harry's name and in agreeing to Harry's demand for total control of the use of his name and for the right to cancel the license at any time. The court's finding that After Six had entered into a licensing agreement with Harry on Harry's terms is not clearly erroneous but rather is supported by the testimony of Toll, which the district court expressly credited, and by the actions of After Six. Finally, the finding that After Six did not own Harry's name is supported by the fact that After Six did not list Harry's name among the trade names it transferred to AZC in the 1981 Agreement.

Thus, we conclude that the district court did not err in finding that After Six did not own the name "Harry Lebow," and hence could not have sold that name to the plaintiffs.

The conclusion that After Six did not obtain the right to use Harry's name except through its 1978 license does not, however, answer the question whether Harry retained the right to use his name, and plaintiffs argue that he was bound to honor the 1969 Agreement not to use that name. We reject this argument because we see no sound basis for treating Harry as a third-party obligor of the 1969 Agreement or for concluding that he adopted that agreement.

 Harry was not a party to the 1969 Agreement. The agreement was entered into by Victor Sr., Waldman, and Kushnick, who were trustees of the trust established by Benjamin Lebow for the benefit of Victor Sr., of which Harry was a 50% contingent remainder beneficiary. The undertakings of the trustees did not purport to impose any obligation on Harry. Paragraph 3(g) stated that the "Sellers" would not use the Lebow name or variants thereof; it did not mention Harry or any other trust beneficiary as a person who would likewise forbear to use such a name. Further, as a matter of law, a trustee, unless he is also an agent for the trust beneficiary, cannot subject the beneficiary to personal liabilities. *See* Restatement (Second) of Trusts § 275 comments, *a, b* (1959); *id.*

§ 8 comment *c*. *See also Cumberland-Perry Area Vocational-Technical School Authority v. Bogar & Bink*, 261 Pa.Super. 350, 354, 396 A.2d 433, 435 (1978) (contract cannot bind a person not party to it). There being no indication that the trustees were also Harry's agents in entering into the 1969 Agreement, the 1969 Agreement itself did not bar Harry's use of his own name. Plaintiffs' contention that Harry was a third-party beneficiary of that agreement, even if correct, would not advance their cause, since the question is not Harry's right to enforce the agreement but rather the right of the plaintiffs to enforce the agreement (as they construe it) *against* Harry. *See generally* 2 S. Williston, *Williston on Contracts* §§ 347, 368 (3d ed. 1959).

 Nor do we see merit in plaintiffs' contention that Harry became bound by the 1969 Agreement by virtue of his signing, as a successor trustee, the 1971 Agreement, which they contend "incorporated" the 1969 Agreement. The 1971 Agreement did not state that the 1969 Agreement was incorporated in it. Rather, the first "WHEREAS" clause of the 1971 Agreement identified the parties to the agreement as "a party" to the earlier agreement; the operative clauses of the 1971 Agreement set forth the terms for the payment of the final portion of the purchase price due from After Six for the stock sold pursuant to the 1969 Agreement. None of the operative clauses of the 1971 Agreement suggests that Harry, who had not been a party to the earlier agreement, was binding himself to that earlier agreement and adding his own personal forbearance to the forbearances of the Sellers in the 1969 Agreement. Although a statement in a "whereas" clause may be useful in interpreting an ambiguous operative clause in a contract, "it cannot create any right beyond those arising from the operative terms of the document." *Genovese Drug Stores v. Connecticut Packing Co.*, 732 F.2d 286, 291 (2d Cir.1984); *see Nelson Dairies, Inc. v. Royal*, 6 Pa.D. & C.2d 371, 373 (Pa.C.P.1955) (stating "general rule that 'recitals in a contract will not control the operative clauses thereof unless the

latter are ambiguous.... In other words, recitals ... cannot control the clearly expressed stipulations of the parties; and where the recitals are broader than the contract stipulations, the former will not extend the latter.'"). Since there is no operative clause of the 1971 Agreement that in any way indicates an agreement by Harry to adopt the burdens imposed on the Sellers in the 1969 Agreement, we conclude that the first "WHEREAS" clause of the 1971 Agreement did not have the effect claimed by the plaintiffs. *See Thrasher v. Rothrock*, 377 Pa. 562, 105 A.2d 600, 604 (1954).

We conclude, therefore, that even if the name "Harry Lebow" be deemed a variant of the name "Lebow," the district court was correct in concluding that Harry had no contractual obligation to forgo the use of his own name in connection with the men's clothing business.

### C. *The Trademark Claim*

Plaintiffs charge that the district court improperly concluded that Harry's use of his name did not infringe the trademarks owned by AZC because it failed (1) to characterize the AZC marks as "arbitrary" or "fanciful," thereby relieving AZC of the burden of proving that the marks had secondary meaning, and (2) to analyze the likelihood of confusion in terms of the factors established in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492. We are not persuaded.

■■■ Words and phrases used to designate products are entitled to varying degrees of statutory trademark protection depending on whether they are classified as (1) generic, (2) descriptive, (3) suggestive, or (4) fanciful or arbitrary. Generic terms, *i.e.*, those that refer to the genus of which a particular product is a species, may not be registered as trademarks under the Lanham Act and hence are given no protection. *See Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9–10 (2d Cir.1976). Terms that are descriptive but not generic may be registered as trademarks only if they have acquired "secondary meaning," in the sense that the name and the business have become synonymous in the mind of the public, submerging the primary meaning of the term in favor of its meaning as a word identifying that business. *See id.* at 10; 1 J. McCarthy, *Trademarks and Unfair Competition*, § 15.2, at 659–60 (2d ed. 1984). Suggestive terms, *i.e.*, those requiring imagination, thought, and perception to reach a conclusion as to the nature of the goods, may be registered as trademarks without proof of secondary meaning. *See Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d at 11. Fanciful terms are those that are "coined," having no independent meaning; arbitrary terms are those that have a meaning, but not one that is usually associated with the product so designated. Like suggestive terms, terms that are arbitrary or fanciful may be registered as trademarks even if they have not acquired secondary meaning. *Id.* at 11 & n. 12.

■■■ Personal names used as trademarks are generally regarded as descriptive terms, not arbitrary or fanciful terms; they are thus protected only if, through usage, they have acquired distinctiveness and secondary meaning. *See* 3A R. Callmann, *The Law of Unfair Competition, Trademarks and Monopolies* § 21.36, at 145–46 (L. Altman 4th ed. 1984) ("An individual name is rather similar to a descriptive word, in the sense that it might properly be regarded as a convenient description of the fact that the named individual is or was affiliated with the firm."); 1 J. McCarthy, *Trademarks and Unfair Competition* § 13.2, at 578. A "guiding principle," established by the Supreme Court in trademark cases involving the use of surnames, is that "[o]nce an individual's name has acquired a secondary meaning in the marketplace, a later competitor who seeks to use the same or similar name must take 'reasonable precautions to prevent the mistake.'" *Taylor Wine Co. v. Bully Hill Vineyards, Inc.*, 569 F.2d 731, 734 (2d Cir. 1978) (quoting *L.E. Waterman Co. v. Modern Pen Co.*, 235 U.S. 88, 94, 35 S.Ct. 91, 92, 59 L.Ed. 142 (1914).

■■■ The district court was thus correct in not viewing the name "Lebow" as an arbitrary or fanciful term and in assessing the degree to which it had acquired

secondary meaning before determining whether plaintiffs were entitled to relief against Harry. As set forth in Part I.D. above, the court found, *inter alia,* that AZC's Lebow trademarks had no secondary meaning; that retailers were neither confused nor likely to be confused with respect to the origin of Harry's products; and that consumers would not be likely to purchase Harry's apparel thinking it was AZC's because the buyers were sophisticated, they would examine the label before buying, the labels to be used by Harry bore no similarity to those of AZC and identified Oakloom as his manufacturer, and the name Lebow had not become identified with the products purveyed by AZC or Lebow Clothes. These findings are adequately supported by the evidence presented at trial, which included testimony that After Six's advertising expenditures were insubstantial for an established company; testimony by a witness who had previously been a marketing consultant for AZC that Lebow Clothes possessed a small and declining share of the market and that "on a consumer level the brand was ... virtually unknown to the vast majority of the people"; and evidence that there are several fashion designers who have the same surnames and operate in the marketplace without apparent consumer confusion. Given the evidence of record, the findings of the trial court that the Lebow name had no secondary meaning and that confusion was unlikely to result from Harry's use of his own name as planned on the Oakloom line of garments are not clearly erroneous.

■ We see no error in the fact that the district court did not expressly mention the *Polaroid* case and its lineup of factors in the course of reaching its conclusions as to the likelihood of confusion. *Polaroid,* which involved dissimilar products but has been applied, to the extent relevant, to consideration of similar products, *see Vitarroz Corp. v. Borden, Inc.,* 644 F.2d 960, 965 (2d Cir.1981), listed a number of factors among those to be considered, including (1) the strength of the mark, (2) the degree of similarity between the two marks, (3) actual confusion, (4) the defendant's good faith in adopting his mark, and (5) the sophistica-

tion of the buyers. *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d at 495. Each of these factors was plainly addressed by the district court. To the extent that plaintiffs focus on the factor of actual confusion, we note that (1) the court found that retailers were not confused since it was well known that Harry was no longer associated with AZC, and (2) there could be no question of actual confusion among consumers since Harry's garments had not yet become available to consumers. The court's findings as to each of the *Polaroid* factors were unfavorable to the plaintiffs, and we have been provided with no basis for disturbing those findings.

We have considered all of plaintiffs' arguments on appeal and find them without merit.

### CONCLUSION

The judgment of the district court dismissing the complaint is affirmed.