**SHALOM BARANES ASSOCIATES, P.C., Plaintiff,**

v.

**900 F STREET CORPORATION, Defendants.**

Civil Action No. 95–2326 (JR).

United States District Court, District of Columbia.

July 18, 1996.

**2**

Wayne G. Travell, Tucker, Flyer & Lewis, Washington, DC, for Plaintiff.

Richard B. Nettler, Lynn Perry Parker, Robins, Kaplan, Miller & Ciresi, Washington, DC, for Defendants.

### MEMORANDUM

ROBERTSON, District Judge.

Plaintiff Shalom Baranes Associates, P.C. (SBA), an architecture firm, complains that defendants have violated its copyright in a document titled "A Feasibility Study Prepared for 900 F Street Associates Limited Partnership" and breached their agreements to pay for architectural services rendered. Defendants, by way of counterclaim, complain that SBA has unlawfully withheld architectural plans that are the property of 900 F Street Associates Limited Partnership. SBA's motion for preliminary injunction based on its copyright claim was denied in an opinion and order dated May 9, 1996. Trial of the remaining claims was held, by the Court sitting without a jury, on June 10, 1996.

### Facts

Defendant 900 F Street Corporation is the general partner of 900 F Street Associates Limited Partnership, which owns a large, unrenovated office building located at 900 F Street, Washington, D.C. R. Donahue Peebles is president of 900 F Street Corporation. He is also president of defendant R. Donahue Peebles Companies, Inc. The limited partnership, its general partner, and the Peebles Companies all use the same offices and mailing address.

In the Spring of 1994, Peebles talked with Shalom Baranes about whether his firm would perform architectural services in connection with the renovation and marketing of 900 F Street. Peebles and Baranes reached an informal understanding, and the architecture firm began work sometime after April 1, 1994. A subsequent letter, signed by Baranes and Peebles and dated August 4, 1994, is the only written memorandum of the agreement. Baranes prepared the letter. Peebles signed it "R. Donahue Peebles, President, 900 F Street Corporation for 900 F Street Associates Ltd. Ptshp." Attached to the letter—but never signed by Peebles—was the standard form contract of the American Institute of Architects. The signed letter incorporated by reference one provision of the AIA agreement, Article 12.1, which spelled-out SBA's scope of work in "Phase One" of the project.[1] The letter stated that

---

**1.** Phase One included the preparation of base plans of 900 F Street, two versions of renovation plans (one of which would require a zoning variance to implement), preliminary floor plate studies, preliminary pricing documents and the Feasibility Study.

"this proposal letter temporarily substitutes for the AIA Agreement" and that SBA's fees would be "$38,500 plus reimbursables." The letter concluded, "[w]e will proceed with additional work only after receiving written authorization from you."

SBA sent Peebles its first invoice for the Phase One work on July 11, 1994. As work continued, the firm submitted invoices to Peebles on a monthly basis. At some point, Peebles told Baranes that SBA's fees would be paid from funds in a "lock box" account controlled by an agent of the Resolution Trust Corporation (RTC), which held a mortgage on the 900 F Street property.

In the fall of 1994, Peebles asked SBA to prepare a submission in response to a solicitation for offers from the General Services Administration. GSA was seeking temporary office space for the Department of Justice. SBA undertook to perform the work in a December 1, 1994 memorandum to Keith McIntosh, a Peebles employee. SBA stated that the project was "an additional service" and that its estimated fee would be approximately $3,500 for the "initial submittal" to GSA.

By January 1995, the Baranes firm had completed and invoiced substantially all of the Phase One work contemplated by the August 1994 letter, including a submission to the D.C. Board of Zoning Adjustment for a zoning variance. The initial submission to GSA was also complete. Monthly invoices now totaled approximately $38,000 for work under the August 1994 letter agreement, several thousand dollars in "reimbursables," and $3,500 for the GSA submission (invoiced as "DOJ Submittal").

At about this time, Baranes called Peebles to discuss the fact that SBA had not been paid for any of its work. Peebles apologized

and said he had not seen the earlier bills. Baranes caused additional copies of all the monthly invoices to be hand-delivered to Peebles' offices on January 12, 1995.

GSA responded positively to the "initial submittal" SBA had prepared. Baranes testified without contradiction that, sometime after December 1, 1994, he and Peebles discussed going after the GSA contract; that he told Peebles the GSA proposal would involve protracted discussions and negotiations; and that SBA would bill for that work on an hourly basis. Baranes also testified that Peebles agreed to pay for the work on those terms. Peebles testimony was that Baranes never informed him that fees for the GSA work would exceed the $3,500 estimate given for the "initial submittal."

From January through March 1995, SBA architects attended a series of meetings with GSA and DOJ officials, responded to GSA requests for information, and, ultimately, prepared new drawings and made new calculations of floor space for the building. The Charles E. Smith Company, a real estate broker hired by the limited partnership to market 900 F Street to GSA, worked with SBA on the project. Memoranda between SBA and the Smith Company outline some of the architectural work requested and performed; copies of them were sent to Peebles. Peebles asked that Baranes attend one meeting with government officials during this period, and Peebles was present at other meetings when SBA architects discussed their work. SBA prepared and sent monthly invoices for those services; its professional fees totaled approximately $19,000.[2] With the exception of a few phone calls and one visit to the Board of Zoning Adjustment in July regarding the pending zoning variance application, SBA had completed its work on all 900 F Street projects by March 31, 1995.[3]

2. Peebles was invoiced for $3,437.50 in professional fees and $761.66 in reimbursable expenses on February 14 for work in January; $9,885 plus $578.69 in expenses on March 8 for February work; and $5,492.50 plus $371.77 in expenses on April 6 for March work. Each bill contained a summary of outstanding balances on prior work in addition to invoices for the new charges. The new charges were under the separate project headings "DOJ SFO" and "GSA Meetings."

3. There is no evidence that Peebles was aware of, or billed for, any work performed by SBA in connection with the BZA application after April 1995. Baranes testified that 99 percent of the BZA work was completed with the submission of the application for a variance on January 16, 1995. He also testified that, after some point, SBA was pursuing the BZA application because "we [didn't] want our work to go to waste." On October 11, 1995, the BZA issued a memorandum approving Peebles' application. An SBA

**4**

In an April 6, 1995 letter to Peebles, Baranes requested payment of the entire outstanding balance of the 900 F Street account, about $65,000. Baranes testified that Peebles never disputed that the amount shown on the invoices was owed. Peebles testified that he agreed to pay $38,500 plus reimbursables pursuant to the August 1994 agreement, but that he was "surprised" at the amount of the additional bills. Peebles also testified, by way of explanation why payment had not been made earlier, that a check written to pay SBA for work under the letter agreement was not approved by the RTC agent who controlled the limited partnership's lock box account because the partnership had exceeded its withdrawal limit.

When SBA's bill was still unpaid in May, SBA turned the matter over to its attorneys and filed the first of two mechanic's liens.[4] On June 23, 1995, through counsel, SBA also demanded the return of its architectural drawings. During July and August, the parties unsuccessfully pursued a settlement. To date, SBA has not been paid for any of its work.

SBA registered its copyright in the feasibility study and underlying architectural drawings on November 22, 1995. Peebles had earlier provided a copy of the feasibility study to Jayne Shister of Cassidy & Pinkard, a real estate broker hired by the limited partnership to find a buyer for 900 F Street. Shister copied two columns of numbers from the feasibility study, representing 900 F Street's "inside gross" and "total rentable" areas, into Cassidy & Pinkard's "Offering Memorandum" on the building. The memorandum was distributed to an unspecified number of prospective purchasers of the property. Upon learning that the feasibility study had been copyrighted, Peebles told Shister not to use any copyrighted material contained in the study.

SBA initiated this action on December 20, 1995. At some point thereafter, Peebles requested that SBA return a set of as-built plans of 900 F Street that Peebles had earlier provided SBA. Because SBA had not been paid, Baranes refused. Peebles engaged another architect to create a new set of plans to show to prospective tenants and purchasers of 900 F Street who asked to see as-built plans of the building. The limited partnership will incur expenses in connection with the development of the new plans, according to Peebles, in an amount "estimated to not exceed $20,000."

**Copyright Claim**

■ For the reasons given in an earlier memorandum denying SBA's application for preliminary injunction, the claim of copyright violation fails as a matter of law. Estimates of 900 F Street's "inside gross" and "total rentable" areas, expressed in square feet, are either facts or ideas incapable of alternative means of expression. In either case, the numbers are unprotected by the Copyright Act. *See Harper & Row, Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985); *BellSouth Advertising & Publishing Corp. v. Donnelley Info. Publishing, Inc.,* 999 F.2d 1436 (11th Cir.1993), *cert. denied,* 510 U.S. 1101, 114 S.Ct. 943, 127 L.Ed.2d 232 (1994). Plaintiff's expenditure of time and money to develop these numbers does not render them protected expression. *See Feist Publications, Inc. v. Rural Telephone Service Company, Inc.,* 499 U.S. 340, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991).

■ Moreover, the arrangement of these numbers in vertical columns by building floor does not evidence sufficient originality to merit copyright protection. *See Feist, supra* (Act envisions some fact-based works in which selection, coordination and arrangement are not sufficiently original to trigger copyright protection).

employee went to BZA's office to pick up the memorandum.

**4.** SBA filed with the District of Columbia Recorder of Deeds a "notice of subcontractor's mechanics lien" in the amount of $70,391 against R. Donahue Peebles Companies on May 26, 1995. On December 5, 1995, SBA filed an "amended mechanics lien" against 900 F Street Limited Partnership in the amount of $73,397. The amount of each lien appears to reflect the application of a one percent per month interest rate to the April 6 outstanding balance, as provided for in the AIA Agreement.

■ Even if the columns of numbers are protected expression, SBA has not sustained its burden of showing that the defendants were responsible for the copying. Peebles' instructions to Jayne Shister not to use any copyrighted material contained in the feasibility study removes from the scope of Cassidy & Pinkard's agency acts of copying or distribution done after the instruction was given. SBA's failure to establish when the alleged copying and distribution occurred provides an alternative basis upon which to deny its copyright claims against these defendants.

## Contract Claims

### 1. August 1994 letter of agreement

■ Defendants concede that SBA is owed $38,500 plus reimbursable expenses of $2,564.10 pursuant to the August 1994 letter of agreement.[5] That agreement did not incorporate the AIA Agreement attached to it, but only Article 12.1 of the Agreement outlining SBA's scope of work. Because the parties did not have an express understanding as to when SBA would be paid, I find that the agreement was breached on February 11, 1995, a date 30 days after SBA invoiced Peebles for the last of the work. Peebles' asserted inability to achieve the release of funds from the RTC lock box account does not excuse the breach because the parties did not agree that payments to SBA would be contingent upon the availability of a specific source of funds.

■ The letter of agreement, signed, as it was, by "R. Donahue Peebles, President, 900 F Street Corporation for 900 F Street Associates Ltd. Ptshp," establishes that liability for the breach runs to the limited partnership and its general partner, defendant 900 F Street Corporation. *See* D.C.Code § 41–112, 41–114, 41–443. There being no evidence that Peebles misrepresented his agency, neither Peebles individually nor R. Donahue Peebles Companies, Inc., was a party to the agreement, and neither may be held liable for its breach. *See Abraham Zion Corp. v. Lebow,* 761 F.2d 93 (2d Cir.1985).

### 2. Further GSA work

Defendants do not dispute SBA's contention that additional work related to the GSA submission was authorized by Peebles or his agent, McIntosh. A December 1, 1994 memorandum to McIntosh contemplates that work on the "initial submittal" to GSA would cost an estimated $3,500. SBA invoices duly reflect $3507.50 in work on the "DOJ Submittal" between November 1 and December 7, for which Peebles was billed on December 14, 1994.

■ Nor do defendants dispute Baranes' testimony that SBA's work in January through March 1995 was performed on behalf of the limited partnership with Peebles' knowledge. What defendants do contend, however, is that this work should be held to have been within the scope of the December 1, 1994, memorandum, which contemplated additional billings of $3,500.

Here, the conflict in testimony requires a credibility determination. Peebles testimony, that the December 1 memorandum covered "anything the Justice Department required," including "the test fit and some other things," is not consistent with the documentary evidence and is not credible. The memorandum states that SBA "will prepare all documents necessary for the Charles E. Smith Company to make an initial submittal ... to [DOJ] on Monday, December 5th." Subsequent memoranda, circulated among the Smith Company, SBA, GSA and Peebles, establish that (1) the initial submission was, in fact, made on December 5, and that (2) a "DOJ Test Fit Submittal," requiring revised plans, new calculations and other work, was prepared by SBA much later, following meetings with government officials in February 1995. In addition, SBA bills show that the January–March work was invoiced—without objection from Peebles—separately and under different project

---

5. SBA invoiced Peebles for $2,564.10 in reimbursible expenses on or before January 11, 1995. Additional reimbursible expenses of $1712.12 were incurred in 1995 and billed after January 11. While placed in the same account as the earlier expenses, the expenses billed after January 11 were not proven to be related to the Phase One work and will be treated as having been incurred in connection with SBA's work on the GSA submission.

names ("DOJ SFO" and "GSA Meetings") than the work on the initial GSA submission.

Baranes testified, moreover, that he told Peebles *after* December 1 and *after* GSA expressed interest in the building (thus necessarily after the "initial submittal" of December 5) that "there was going to be protracted negotiation/discussion" with GSA and that "we are going to go on an hourly basis." Baranes testified that Peebles said "Fine, just bill me." Peebles did not deny making this statement, but only stated that he was "surprised" to see how much the work cost when he finally got around to reviewing SBA's monthly invoices. (Peebles assertion that he did not see the invoices is no defense to plaintiff's claim, nor, indeed, is it consistent with Peebles' effort to avoid individual liability for SBA's fees.)

In sum, the evidence establishes that either an express contract or a contract implied-in-fact, *see Brown v. Brown*, 524 A.2d 1184, 1190 (D.C.1987), existed between SBA and the limited partnership concerning the GSA work. That contract required the partnership to pay SBA for services rendered at SBA's customary hourly rates. Because there is no dispute that the work was performed, nor any contention that SBA's hourly rates were unreasonable, SBA is entitled to the amounts it invoiced Peebles for the work, summarized in its April 6, 1995 bill.[6]

*3. Prejudgment interest*

■ SBA is entitled to an award of prejudgment interest as an element of its damages, *see* D.C.Code § 15–109, for its Phase One and "GSA initial submittal" work for which fees were agreed in advance. Interest is thus to be computed beginning February 11, 1995 on all amounts invoiced on or before January 11, 1995. The rate of interest shall be the prime rate in effect on the date inter-

est begins to accrue. *See Forman v. Korean Air Lines Co., Ltd.*, 84 F.3d 446, 450 (D.C.Cir.1996).

## Mechanic's Lien

Both of SBA's notices of mechanic's lien are defective and unenforceable. The May 26, 1995 notice is of a subcontractor's lien against defendant R. Donahue Peebles Companies, Inc. That defendant is not indebted to SBA, nor was SBA its, or anyone's, subcontractor. The December 5, 1995 lien names the right defendant but is out of time. *See* D.C.Code § 38–102 (lien must be filed within three months of completion of work).[7]

## Conversion Counterclaim

■ Peebles' unrebutted testimony about SBA's refusal to return as-built plans of 900 F Street owned by the limited partnership establishes conversion of the plans, *see Shehyn v. District of Columbia*, 392 A.2d 1008 (D.C.1978), and Baranes' plea of self-help does not excuse the tort. SBA will be directed to return the plans.

■ Defendants have not, however, proven damages. The traditional standard for calculating damages for conversion is the fair market value of the property at the time of conversion. *Bowler v. Joyner*, 562 A.2d 1210 (D.C.1989). Peebles' testimony that the partnership "will incur" expenses "not to exceed $20,000" in connection with having new plans made is not evidence of the market value of the plans, and is far too vague to support an award of damages based on the plans' replacement cost.

An appropriate order accompanies this memorandum.

### *ORDER*

For the reasons set forth in the accompanying memorandum, it is this 17th day of July, 1996, hereby

---

6. SBA also billed Peebles $366.25 for "additional owner requests" not specifically related to the GSA work. Baranes' testimony and SBA's invoices are sufficient proof that these charges were incurred at the behest of the partnership or its agents. SBA is thus entitled to their payment as well. SBA did not claim damages for the small amounts of work performed after March 31, 1995.

7. An SBA employee apparently went to the Board of Zoning Adjustment in October 1995 to retrieve a memorandum approving Peebles' zoning variance but the parties' relationship had soured by then, and Peebles never asked for, or received, the memorandum.

**ORDERED** that plaintiff shall have judgment on its breach of contract claim against defendant 900 F Street Corporation in the amount of $65,464.97 plus prejudgment interest computed on the principal amount of $44,571.60, at the prime rate of interest, from February 11, 1995 until the date judgment is entered. Plaintiff may submit a form of judgment, with information supporting its calculation of interest. It is

**FURTHER ORDERED** that plaintiff return to defendant 900 F Street Corporation forthwith any and all architectural plans in plaintiff's possession that are the property of 900 F Street Associates Limited Partnership. It is

**FURTHER ORDERED** that plaintiff's copyright claim be, and it is hereby, dismissed.